**Peter ORTEGA**

v.

**CONSTRUCTION AND GENERAL LABORERS' UNION NO. 390, et al.**

**Civ. No. H–75–95.**

United States District Court,
D. Connecticut.

June 6, 1975.

---

Raphael L. Podolsky, Waterbury, Conn., for plaintiff.

Steven D. Pierce, Hartford, Conn., Donald J. Deneen, Windsor, Conn., for defendant.

## RULING ON MOTION TO DISMISS

BLUMENFELD, District Judge.

The defendant union, of which the plaintiff in this Title VII action is a member, has moved to dismiss the plaintiff's case.[1] The dispute here is not complicated: the plaintiff, a Puerto Rican, alleges that his union discriminated against him in various ways because of his race, color, and national origin. To understand the complex procedural history, on the other hand, considerable exposition is desirable.

### I.

On November 2, 1973, Ortega filed complaints against his union with both the Connecticut Commission on Human Rights and Opportunities (CHRO)[2] and the federal Equal Employment Opportunities Commission (EEOC).[3] The EEOC deferred consideration of the matter until February 13, 1974, giving the CHRO temporary primary jurisdiction of the matter as required by 42 U.S.C. § 2000e–5(d) (Supp. II, 1972).[4] *See* Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); Voutsis v. Union Carbide Corp., 452 F. 2d 889 (2d Cir. 1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1972). On September 23, 1974, the CHRO dismissed Ortega's charge for "lack of sufficient evidence." Ortega's request for reconsideration of this disposition was denied by a letter dated November 8, 1974. On December 19, 1974, the EEOC gave Ortega a right-to-sue letter pursuant to 42 U.S.C. §

1. Because materials outside the pleadings have been supplied (by both sides), the motion is treated as one requesting summary judgment. *See* Fed.R.Civ.P. 12(b).

2. The complaint, number F.E.P. 399–3, alleged the following discriminatory treatment: "Since joining the union, on March 26, 1970, to the present I believe the respondent union has excluded me from full membership rights annd discriminated against me because of my Puerto Rican ancestry in that I have been sent to few jobs by this Union and in that when I did secure a job the union through its agents made it difficult for me to continue on the job. I also believe that since I filed a complaint with the Commission on Human Rights and Opportunities on October 6, 1971 the respondent union has discriminated against me because I opposed an unfair employment practice in that the respondent union through its agents has informed at least one employer that I was a trouble maker because I filed a complaint with the Commission. I also believe that the respondent union has aided, abetted compelled and coerced the doing of an unfair employment practice in that the respondent union through its agents has on at least one occasion participated in my dismissal from employment and has also through its actions deprived me of the opportunity to become a steward on a job and has through its actions deprived me of the opportunity to earn overtime wages."

3. The complaint, case file number TB04–718, alleged the following discrimination against Ortega on the basis of his national origin: "Respondent has referred me to few jobs. Respondent has discriminated against me because I filed [an earlier] complaint with the Connecticut Human Rights Commission. Respondent has coerced employers and potential employers to discriminate [against] me."

4. The parties apparently agree that the CHRO has the characteristics necessary for an agency to which the EEOC is required to defer. *See* 42 U.S.C. § 2000e–5(c) (Supp. II, 1972); 29 C.F.R. § 1601.12 (1974).

2000e–5(f)(1) (Supp. II, 1972).[5] Ortega's complaint in this court was filed on March 19, 1975.

One factor complicating this suit is Ortega's filing of a second set of charges with the EEOC and CHRO on September 24, 1974.[6] The union argues that this evidences an election by Ortega to continue pursuit of his remedies in administrative bodies that precludes

5. The defendant appears to regard this as evidencing, a dismissal of Ortega's complaint (except insofar as it urges that Ortega's second EEOC charge, discussed at pp. 3–5, *infra*, should be construed as reopening the issues in his first complaint). In taking this position the defendant simply misapprehends the law. After 180 days from the end of the required deference to the CHRO, an EEOC complainant has an unqualified right to a right-to-sue letter. *See* 29 C.F.R. § 1601.25b(c) (1974). Thereafter the EEOC may continue the investigation on its own motion or that of a party to the charge. *See* 29 C.F.R. § 1601.25b(d) (1974). It does not appear from the record whether the investigation is ongoing in Ortega's case.

6. Ortega filed a five-paragraph charge with the CHRO on that date; the copy before the court does not contain a complaint number. An "amended" charge, dated October 3, 1974, and bearing number F.E.P. 519–3, is nearly identical, differing materially only in that it describes the facts underlying the conclusory statement in the September 24 charge that the union discriminated with respect to referrals. Thus the defendant's contention that the October 3 charge is an amendment of Ortega's 1973 complaint, F.E.P. 399–3, is specious.

The October 3 version of the 1974 charge is as follows:

"[On or about] July, 1974, I was suspended from the above-named union allegedly for nonpayment of dues. I believe I was suspended after having filed charges with the Connecticut Commission on Human Rights and Opportunities alleging unfair employment practices and because of my Puerto Rican ancestry.

"I believe that non-Puerto Rican persons are subjected to different reinstatement procedures.

"I believe that in regard to reinstatement procedures and in regard to referral procedures the above-named union has discriminated against me and other persons because of our Puerto Rican ancestry and because I have filed charges with a state agency alleging unfair employment practices.

"On numerous occasions I have attempted to secure employment at various job sites in the Waterbury area. I was told by an agent of the contractor that I would not be hired unless I was sent by the Construction and General Laborers Union, Local 390. During my visits to the job sites I never saw any persons working at the construction projects whom I believe to be of Puerto Rican ancestry.

"Based on the above facts I believe that Construction and General Laborers union, Local 390 continues to bar me from employment on the basis of ancestry (i. e. subsection 31–126(a) [of Conn.Gen.Stat.]). Also on the basis of the above facts I believe the Construction and General Laborers Union, Local 390 . . . have aided, abetted, incited, compelled, or coerced each other in the doing of unfair employment practices (i. e. subsection 31–126e). I further believe that as a labor organization Construction and General Laborers Union, Local 390 has excluded and continues to exclude me from full membership rights (i. e. subsection 31–126c).

"I believe the employment referral and membership practices noted above have discriminated and continues [*sic*] to discriminate against me and may have discriminated or could discriminate against others similarly situated on the basis of ancestry, Puerto Rican.

" . . . . "

The EEOC charge, number TB05–0890, is not before me. Ortega's affidavit states that it concerns the same subject matter as the CHRO complaint and was filed on September 24, 1974. The defendant received a notice of this charge dated December 3, 1974, that has been produced. The defendant has also produced a letter to its counsel from the EEOC answering an inquiry about the status of Ortega's September 1974 charge. The letter is dated April 8, 1975, and states that the EEOC "routinely reviews the final actions of the Connecticut Commission on Human Rights and Opportunities in order to accord substantial weight to their findings and to avoid duplicating efforts. Therefore, all actions by EEOC will be held in abeyance until we have been notified that the state has completed processing the charge. At that point, we will determine whether further action by EEOC is necessary." The CHRO has not yet taken any action with respect to Ortega's September 24 charge.

maintenance of this suit. There is, however, no "election of remedies" doctrine in Title VII cases; a plaintiff may seek to vindicate his rights before as many bodies as have jurisdiction to help him. *See* Voutsis v. Union Carbide Corp., 452 F.2d 889 (2d Cir. 1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1972).

The defendant's alternative argument is that the second set of charges is, in effect, an amendment or request for reconsideration of the first set. Because the second set is still pending before the CHRO and EEOC, the union concludes that none of the charges have yet been "exhausted" before the administrative agencies and that this suit should therefore be dismissed. This argument too misses the point. Title VII does not require a complete exhaustion of available remedies; it only requires the degree of exhaustion mandated by the statute. As to the first set of charges, the statute has been fully complied with: a charge was filed before the CHRO; the EEOC deferred to it for at least 60 days; after waiting 180 days beyond the end of that period of deference the EEOC issued a right-to-sue letter; there is no challenge to the timeliness of Ortega's subsequent complaint in this court. *See* 42 U.S.C. § 2000e–5(c)–(d), –(f)(1) (Supp. II, 1972). The union has challenged the timeliness of Ortega's filing before the administrative bodies; for reasons explained in Part II of this opinion, those challenges are rejected. Ergo, whether or not Ortega has fully exhausted his administrative remedies, he has fulfilled the statutory requirements for suit on his charges of November 2, 1973.

The second set of charges stand in a different posture, however. The plaintiff has not yet obtained a right-to-sue letter from the EEOC on his second charge and thus may not treat the procedures followed with respect to that charge as meeting the statutory exhaustion requirement. The remaining question, therefore, is whether the scope of the issues raised by the complaint is limited to the scope of the first EEOC charge.

[5, 6] In determining whether particular allegations in a complaint are sufficiently related to the allegations in an EEOC charge as to which there has been sufficient exhaustion, courts have used two similar standards. One is that the judicial proceedings may encompass any discrimination like or reasonably related to that alleged in the EEOC charge, including new acts occurring during pendency of the EEOC charge. *See, e. g.,* Alpha Portland Cement Co. v. Reese, 507 F.2d 607 (5th Cir. 1975); Oubichon v. North American Rockwell Corp., 482 F.2d 569 (9th Cir. 1973); Willis v. Chicago Extruded Metals Co., 375 F.Supp. 362 (N.D.Ill.1974); Russell v. American Tobacco Co., 374 F.Supp. 286 (M.D.N.C.1973); Hecht v. CARE, Inc., 351 F.Supp. 305, 311–312 (S.D.N.Y.1972). The other standard, which may in fact be no different, is that the court proceedings may include everything within the scope of the EEOC investigation that might reasonably be expected to grow out of the charges. *See, e. g.,* Tipler v. E. I. duPont deNemours & Co., 443 F.2d 125, 131 (6th Cir. 1971); Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970). The expectable scope of the EEOC investigation is *very* broad, apparently including, *inter alia,* new acts occurring during the pendency of the EEOC charges. *See, e. g.,* EEOC v. Huttig Sash & Door Co., 511 F.2d 453 (5th Cir. 1975). It does not make any difference which standard is used here, for the complaint satisfies both. The essence of Ortega's first EEOC charge is that the union discriminates against Puerto Ricans and retaliates against those who bring such discrimination to the attention of the *CHRO. See* note 3 *supra.* This is also

the essence of Ortega's complaint here.[7] The fact that the complaint spells out the union's alleged sins in greater detail is not a variance fatal to this action; indeed, it is entirely expectable:

> "To compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected. . . ."

Willis v. Chicago Extruded Metals Co., 375 F.Supp. 362, 365 (N.D.Ill.1974).

The breadth of the standards used leads to an interesting result in this case: it appears that the charges made in September 1974 are sufficiently related to the November 1973 charges to be litigated here.

> "To force an employee to return to the EEOC every time he claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier. . . ."

*Id.* Thus the September 1974 charges were, for purposes of this lawsuit, surplusage.

## II.

The defendant also argues that the statute of limitations for filing claims before the EEOC was not satisfied, as it must be if suit is later to be brought. *See, e. g.,* Moore v. Sunbeam Corp., 459 F.2d 811 (7th Cir. 1972). The November 1973 charge referred to an incident the union identifies as having occurred in March 1973, somewhat more than 200 days earlier. As the union assumes that the applicable limitations period is 180 days, it claims that the suit must be dismissed for failure to track the statute. The plaintiff points out, however, that the statute is more complex than the defendant has assumed. Title 42 U.S.C. § 2000e–5(e) (Supp. II, 1972) provides a 300-day limitations period for complaints to be filed before the EEOC when there is a state agency such as the CHRO in the picture.

7. The relevant portion of Ortega's complaint reads as follows:

"(14) In terminating the plaintiff's employment, the defendant employer acted at the instigation of, and in cooperation with, the defendant labor organization, which sought the termination of the plaintiff's employment because of his race, color, and national origin, and because of his previous exercise of his right to make and file charges until Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act, in violation of 42 U.S.C. § 2000e–2 and § 2000e–3.

"(15) Since March 16, 1973 to the present time, the defendant labor organization has engaged in continuing and ongoing discrimination against the plaintiff in at least the following manners:

(a) It has provided him with fewer job referrals than it has provided to other of its members who were equally available and seeking referrals;

(b) It has provided him with job referrals of lower quality, for jobs of shorter duration, and with less potential for long-term employment than were provided to other of its members who were equally available and seeking referrals;

(c) It has engaged in a pattern of harassment against the plaintiff to discourage him from coming to the union hall or seeking job referrals through the union.

(d) It has influenced and coerced employers and potential employers not to hire the plaintiff.

"(16) In engaging in the conduct described in ¶ 15, the defendant labor organization has discriminated against the plaintiff because of his race, color, and national origin, and because of his previous and continuing exercise of his right to make and file charges under Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act, in violation of 42 U.S.C. § 2000e–2 and § 2000e–3.

"(17) As a result of the conduct of the defendant labor organization, the plaintiff has been precluded from obtaining employment as a general laborer on union construction jobs in the Waterbury area."

■ This does not end the argument, however. The defendant alleges that the charge filed in November 1973 with the CHRO was untimely. *Cf.* Conn.Gen.Stat.Ann. § 31–127 (Supp.1975). However the defendant does not cite any authority to support this as a basis for dismissal of Ortega's case. There is no explicit requirement in Title VII that the state procedure be timely invoked in order to preserve access to the courts. A requirement of timely filing before the state agency might be found to be implicit in Title VII's command that adequate state remedial procedures first be utilized, however. *Cf.* Richardson v. Miller, 446 F.2d 1247 (3d Cir. 1971). But· in this case the underlying policies of Title VII have been fully effectuated: the CHRO considered Ortega's complaint on the merits and acted as it would have with respect to a timely filed charge. *See* p. 540 *supra.* Thus there is no point in implying a requirement of timely filing with the CHRO in this case.

■ There is one further issue arising (although not raised by the defendant) from the alleged untimeliness of Ortega's complaint to the CHRO. One court has found that timely filing before the appropriate state agency is necessary, not for its own sake, but in order to make the 300-day federal limitations period applicable. *See* Olson v. Rembrandt Printing Co., 375 F.Supp. 413 (E.D.Mo.1974). I am not persuaded to follow that view. Title 42 U.S.C. § 2000e–5(e) (Supp. II, 1972) provides in part that

"in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with re-

spect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . .."

If the CHRO finds that it lacks the authority referred to in the statute by reason of failure of the complainant to comply with the state limitations period, *cf.* Conn.Gen.Stat.Ann. § 31–127 (Supp. 1975), it will presumably dismiss the charge and thus trigger the 30-day federal limitations period. In other words, the short 30-day period in the federal statute affords some protection for a respondent when state charges against him are untimely filed short of abrogation of the complainant's right to sue. Given Title VII's policy of providing an avenue for redress of injuries by reason of discrimination, the result reached in *Olson* does not seem to be required. Moreover, allowing the state agency to interpret and enforce its own state statute of limitations is in accord with principles of comity. Difficult issues of state law will not thereby need to be resolved by the federal courts.[8] Thus I hold that since the CHRO did not dismiss Ortega's charge for failure to comply with Conn.Gen.Stat.Ann. § 31–127 (Supp.1975), the federal charge is subject to the 300-day limitations period. In this case, therefore, the EEOC charge was timely filed.

For the foregoing reasons the union's motion to dismiss, treated as a motion for summary judgment, must be denied. It is

So ordered.

---

8. That such issues may arise and prove troublesome is proven by this case. It is clear that Ortega's first CHRO complaint alleges a continuing course of discrimination against him. Many courts have held under Title VII that such allegations render inapplicable the limitations period for filing before the

EEOC. *See, e. g.,* Kohn v. Royall, Koegel & Wells, 59 F.R.D. 515 (S.D.N.Y.1973), appeal dismissed, 496 F.2d 1094 (2d Cir. 1974). No Connecticut court has yet been presented with the issue whether the state limitations statute, Conn.Gen.Stat.Ann. § 31–127 (Supp.1975), should be similarly construed.