Mary Pat KING

v.

**NEW HAMPSHIRE DEPARTMENT OF RESOURCES AND ECONOMIC DEVELOPMENT, HAMPTON BEACH METER PATROL, James C. Connor, as he is Chief of the Hampton Beach Meter Patrol.**

**Civ. A. No. 76–184.**

United States District Court,
D. New Hampshire.

Oct. 8, 1976.

As Amended Oct. 27, 1976.

Susan H. Frey, Cambridge, Mass., Martin, Morse & Wylie, Boston, Mass., Claudia C. Damon, Sheehan, Phinney, Bass & Green, Manchester, N.H., for plaintiff.

Donald W. Stever, Jr., Asst. Atty. Gen., Concord, N.H., for defendants.

## OPINION AND ORDER

BOWNES, District Judge.

The plaintiff, Mary Pat King, is a twenty-four year old woman who is a permanent resident of Hampton, New Hampshire, residing at Acorn Street.

The defendant Hampton Beach Meter Patrol is a subsidiary agency of the Division of Parks of the Department of Resources and Economic Development of the State of New Hampshire.

Plaintiff alleges that defendant's refusal to employ her as an officer of the Hampton Beach Meter Patrol (Meter Patrol) was a result of discrimination based on her sex in violation of 42 U.S.C. § 2000e *et seq.*

Defendant denies that it discriminated against plaintiff and contends that "[d]efendant's refusal to hire plaintiff was solely on account of her lack of fitness for the position, as evidenced by an unfavorable and unreliable work record elsewhere." It also states that "[c]ompeting applicants possessed superior references and work experience." Defendant's Answer at 2.

Jurisdiction is pursuant to 28 U.S.C. § 1343(4), 28 U.S.C. § 2201, and 42 U.S.C. § 2000e–5(f)(1)(A).

There are five steps which must be accomplished before a plaintiff may bring a civil action pursuant to 42 U.S.C. § 2000e. They have been set forth succinctly in *Kaplowitz v. University of Chicago*, 387 F.Supp. 42, 48 (N.D.Ill.1974):

In order to better understand defendant's arguments it is useful to set forth briefly the statutory scheme encompassed by 42 U.S.C. § 2000e *et seq.* [1] Any individual claiming to have been the victim of an unlawful employment practice may file a charge with the Equal Employment Opportunity Commission, which commission was created under the statute to handle these charges. 42 U.S.C. §§ 2000e–4 and 2000e–5(a). [2] The EEOC investigates the charge and makes a determination as to whether there is probable cause to believe the charge is true. [3] If there is not, the charge is dismissed; if there is, the Commission attempts to resolve the problem through informal methods of conference, conciliation, and persuasion. 42 U.S.C. § 2000e–5(b). [4] If conciliation efforts fail the EEOC notifies the aggrieved party, and a civil action may be commenced by either the EEOC itself or the charging party. 42 U.S.C. § 2000e–5(f).

[5] Even if the EEOC dismisses the charge, a complaining party may still file a civil action under § 2000e–5(f). However, bringing a charge before the EEOC

is a jurisdictional prerequisite to the filing of a suit for Title VII violations under this section. *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 719 (7th Cir. 1969).

In addition, plaintiff must follow the procedures delineated in 42 U.S.C. § 2000e–5(c):

(c) *State or local proceedings.* In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a)[(b)] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

Plaintiff has complied with each of these procedures.

Because plaintiff alleges continuing discrimination, her initial compliance with the various procedural requirements will serve as a jurisdictional basis for this court to consider her allegations involving all three years.

A charge of discrimination is *not* filed as a preliminary to a lawsuit. On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC *fails* to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation. Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970).

In the instant case, the Equal Employment Opportunity Commission (EEOC) has investigated and has been given the opportunity to conciliate. The purpose of the EEOC filing requirements has been met. This court does not find any essential difference between prior and subsequent acts in terms of whether they can be alleged in a judicial complaint so long as the allegations in the complaint could reasonably be expected to grow out of the EEOC charge or the EEOC investigation. *Sanchez, supra,* 431 F.2d 455; *Ortega v. Construction General Lab. U. No. 390,* 396 F.Supp. 976 (D.Conn.1975). Title VII

contemplates that no *issue* will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance. *Sanchez, supra,* 431 F.2d at 467. (Emphasis added.)

The act alleged is clearly within the scope of both the complaint and the EEOC investigation. *Accord, Guay v. Public Service Company,* Civ. No. 76–61, Interim Order (D.N.H. 7/26/76).

## THE TESTIMONY

In each of the past three summers, 1974, 1975, and 1976, plaintiff has applied for

employment to James C. Connor, Chief of the Hampton Beach Meter Patrol, and, in each of these years, she was turned down after personal interviews with Connor.

### Testimony of Connor as to Job Requirements

Connor selects personnel without guidelines and with little supervision from the Division of Parks in Concord. During his tenure as Chief, which goes back to 1965, there have been two women hired for the Meter Patrol, but they have been clerks or secretaries, not Meter Patrol officers. He offered a position of Meter Patrol officer to a woman in 1975, but she was unable to accept. Other women have spoken with Connor about employment, but no other woman has filed an application for the position.

There are five full-time Meter Patrol officers and five part-time officers. Their principal duty is to patrol the meters in Hampton Beach, which extend from the Hampton River on the south along the Boulevard to North Beach with two breaks in the rows of meters and many "leased-out" areas which would otherwise be metered. Patrol is performed either on foot or on motorcycle.

The daily duties of a Meter Patrol officer include patrolling the meters, ticketing violators, and dealing with people whose cars are towed. In addition, Meter Patrol officers might become responsible for unjamming meters, helping out with health problems, and supervising accident scenes until the police arrive.

Meter Patrol officers are in charge of taking fine boxes to the banks, and they have access to all money collected as fines on any given day. The officers carry no weapons or handcuffs; the Town of Hampton is responsible for general police work. Officers do make use of heavy tools, but this constitutes less than 1% of the job. Connor concluded that there is no reason why a woman could not perform the duties of a Meter Patrol officer.

### 1974

### Plaintiff's Testimony

Plaintiff's job application, Exhibit 1, shows that she made application for a job with the Meter Patrol of Hampton Beach on March 19, 1974. It gives her name, sex, age, social security number, and an address in West Somerville, Massachusetts, where plaintiff was a student at Tufts University. It also gives her marital status, weight (108 pounds), and other detailed information. Also included is a Massachusetts telephone number. The application shows that plaintiff was willing to accept full or part-time employment.

The second page gives a history of schools attended and dates concluding with plaintiff's attendance at Tufts University from 1970 through 1974 and her then anticipated Bachelor of Arts in Child Study. The application also reveals that plaintiff has a driver's license and teaching certification. There are spaces provided, but not filled in, for an employment record.

On the back of the application in a space for additional information are two names, Mrs. Hollingsworth and Mrs. Debbie Pugatch. These names are in different ink and were, according to the testimony, supplied at the interview. After Mrs. Pugatch's name is an address and explanation "(teacher/student-taught with)." Three additional references are given: Sgt. John Nickerson, Victor Demarco [sic], and Dr. Segmour Friedland. The application is signed "Mary Pat King."

Stapled to the application is a piece of paper with additional information: "Kings Supermarket, Orange, N. J., 1968; Hollingsworth Hotel, 1972, waitress; Lincoln House 1972; waitress Jerry's Restaurant." Connor testified that this note is in his handwriting, that he had recently affixed the note to the application, and that he believed, but was not sure, that the note was from his initial interview with plaintiff in 1974.

After filing a job application in the spring of 1974, plaintiff had an interview with Connor. The interview lasted twenty

minutes and there was no discussion, only some mention, of her experience as a student-teacher. There was no discussion of her work experience as a waitress or her extracurricular experience as a one-to-one tutor with emotionally-disturbed boys at the Hobb's School.

Much of the support for plaintiff's allegation that she is the victim of sex discrimination comes from the discussion which allegedly took place at this interview. She was asked if she had ever used a sledge hammer, and she replied: "No, but I would be willing to learn to use one." Connor then told her that Meter Patrol officers were sometimes required to use one to help the State maintenance crew in servicing meters. Connor told plaintiff that she might sometimes need to become involved in making arrests and stakeouts, and he asked how she would "run someone in." She replied that, if she needed help, she would seek it from the Town of Hampton Police.

Plaintiff was asked "a whole list of qualifications from a sheet." These included experience in construction, in stress situations, and in communications, as well as others. She felt "encouraged" before the interview, but during the interview she felt "defensive."

Plaintiff had arranged to call Connor regarding her application. When she called, Connor said there were no vacancies because of returning members from previous years, but that she was "first or second on his list." She never received any other notification of the rejection or acceptance of her application.

### Connor's Testimony

Connor remembers that plaintiff was not quite sure how to present herself as a job applicant in the 1974 interview. He did not recall discussing plaintiff's ability to use a sledge hammer. Connor then identified a memorandum from himself to Mr. Carpenter in the Division of Parks, Exhibit 19, in which he said:

One misquote was about the sledge hammer. All applicants are asked among other things about construction experience. Because of her 108 lb. weight I asked if she had ever tried to use one. We use a 20 lb. driving device and a 16 lb. sledge hammer.

The memo refreshed Connor's recollection. He remembered asking her if she could use a sledge hammer because he questioned whether she could safely wield the hammer.

Connor did remember asking plaintiff how she would handle an arrest. He asked plaintiff about construction experience because of her size, not her sex, and he has asked others about construction experience.

Connor did not consider experience at waitressing or sales clerking to be much of an asset to the Meter Patrol. Neither provide sufficient opportunity to interact with other people, particularly under stress situations.

Connor knew that plaintiff had worked at Jerry's Restaurant and at Lincoln House from her 1974 interview and had been given the name of plaintiff's teaching supervisor at Tufts, Mrs. Pugatch, and the names of two personal references, Mr. DeMarco and Dr. Friedland.

Plaintiff had testified that she left her employment at Lincoln House because she had been asked out by the manager, Mr. Dougherty, had turned him down, and had subsequently been baited and given a sufficiently hard time to prevent her from adequately performing her duties as a waitress.

Connor testified that he had attempted to reach Mrs. Pugatch, but had been unable. He did speak with Dougherty from the Lincoln House, who said that plaintiff had quit due to teasing. This revealed to Connor that plaintiff might not be able to work under stress. Connor, a teacher at Pentucket Regional School during the school year, relied heavily on Dougherty who had been a student of his and who is a "respected" member of the Hampton community. Connor was unable to reach Mona, the supervisor at Jerry's Restaurant, or Dr. Friedland. Connor did speak with DeMarco, who said she was a nice girl and that he should

have a woman on the Patrol. At one point, Connor, who seemed confused about when he spoke with whom, spoke with the owner of Jerry's Restaurant, who did not remember plaintiff.

Connor did hire one person for Meter Patrol in 1974, William J. Martin, a copy of whose application is Plaintiff's Exhibit 14. Martin was a thirty year old teacher at Pentucket Regional School, the same school at which Connor is a teacher. Martin is a 1966 graduate of Northeastern University with a Bachelor of Science in Education. He had taken additional courses in counseling at Massachusetts State College at Salem and had been teaching at the Pentucket Regional School for over seven years. Martin was still a member of the Meter Patrol during the summer of 1976. It is defendant's contention that Martin was a better candidate for Meter Patrol than King and that is the reason why she was not hired to fill the only vacancy that year.

## 1975

### Plaintiff's Testimony

In February or March of 1975, plaintiff called Connor at home to ask if she were still first or second on his list. He affirmed her position on his list, but said that he did not know whether there were any job openings.

Plaintiff did not file a new application, but sent the following letter, Exhibit 2, instead:

P.O. Box 9
Hampton, N. H.
March 21, 1975

Dear Mr. Connor,

Above is my new address. Last summer, I worked as a salesperson at J. and J.'s Sportswear at Hampton Beach. In the fall, I worked in the country store of Applecrest Orchards.

I have taken another French course and have had additional practical experience in Canada. I feel that this will be a tremendous asset to me on the Meter Patrol, also a very good knowledge of the area.

Thank you very much.
Sincerely,
Mary Pat King

Plaintiff claims that she tried to reach Connor by telephone several times on April 9th and 10th, finally reaching him in the evening of the 10th. He seemed angry with her. She was told that all his men were coming back and that he knew of no openings.

On May 1st, plaintiff received a postcard which asked her to arrange an interview with Connor. The interview was held on May 3rd at the Meter Patrol office. Plaintiff was asked for job references from the current date all the way back to her job at Kings, a part-time high school job. She was not asked to explain any negative references. She was not asked for information concerning her employment at Applecrest Gift Shop or J. and J.'s Sportswear. Connor did give her the Meter Patrol phone number, which she did not write down correctly.

### Connor's Testimony

Connor made notes at the 1975 interview. Exhibit 21. There are additional undated notes, Exhibit 22, which Connor believes to be from 1975.

He claims to have been aware of plaintiff's additional work experience from her letter and from his notes. He also noted that she spoke French, which had been polished during a recent trip to Canada.

Connor had no reason to change his opinion of plaintiff after the 1975 interview. He did check her work reference at Applecrest and got a very positive response, but nothing specific enough to be applicable to her application to the Meter Patrol. Connor did not reach Mr. Attaya of J. and J.'s Sportswear. He was sure it would be a favorable reference, since she had been invited back to the job, and he was sure it would be difficult to reach Attaya because of the seasonal basis of Hampton Beach business. He did not believe that Attaya would add much to his knowledge of plaintiff's qualifications because of the close supervision given to store clerks as opposed to Meter Patrol officers.

Alan Mason, a teacher at Pentucket Regional School for seven or eight years, and

Connor's assistant in 1975 and 1976, was also present at the interview. He testified and confirmed most of Connor's testimony concerning that year and 1976. Mason testified concerning other areas still to be discussed. His testimony has been considered, but, for the sake of brevity, will not be discussed further as it mostly reiterates testimony by Connor.

On May 10th, plaintiff was notified by letter, Exhibit 3, that she was not hired.

On July 23, 1975 plaintiff again met with Connor. This meeting, called at Connor's request, seems to have been only for the purposes of discussing plaintiff's previous application and denial. Plaintiff recalled no discussion concerning unfavorable references from previous jobs or any defects in the application itself. Connor testified that the meeting was not an official interview. Plaintiff had originally thought she was to have a job interview. In fact, she did fill out a new application. Exhibit 7. The new application, besides the information contained in the first application, provides a relatively complete job history. It gives an address of Box 9, Hampton, New Hampshire, and a telephone number at J. and J.'s Sportswear and new personal references.

In late July of 1975, Connor was notified that the Legislature had appropriated funds for an additional Meter Patrol officer. Connor contacted plaintiff for a new interview. The two could not arrange a mutually convenient time, and they agreed to let the last official interview serve.

Connor contacted plaintiff's superior at Jerry's Restaurant. She told him, according to Connor, that plaintiff had not been prompt and sometimes did not show up due to personal problems and had been terminated for these reasons. Connor also called Kings, where plaintiff had worked while attending high school. Kings confirmed that plaintiff had worked there and left because of school vacation. Mrs. Hollingsworth, of Hollingsworth Inn, could not recall plaintiff, but her accountant did confirm that plaintiff had worked there.

Brian Liberty, a twenty year old resident of Portsmouth, New Hampshire, applied for this position in 1975. His application is Exhibit 15. Liberty, who had completed his sophomore year at Plymouth State College, provided references from previous employment, which included responsibilities for loading trucks, making deliveries, bagging groceries, and cleaning a grocery store. Connor was impressed with Liberty's references and his general manner and appearance. Liberty was hired.

Frank Linnane also applied and was employed as a Meter Patrol officer in 1975. His application is Exhibit 17. Linnane, who was forty-nine years old at the time of his initial application, is a high school graduate. Linnane is an Army Veteran who had been employed by the United States Post Office at Hampton for the previous sixteen years. Prior to that, he spent twelve years working for a lumber corporation. Linnane supplied no references on the written application.

Richard Ladd, whose application is Exhibit 16, applied for the Meter Patrol position in 1975 and was hired. Ladd, a forty-seven year old science teacher with a master's degree in education and teaching certification, also applied and was hired as a Meter Patrol officer. Ladd is an Army Veteran who has taught at the same high school for twenty-two years. He had been employed for the preceding ten summers as director of recreation for the Town of Hampton and had spent one summer as a police and meter patrol person for the Hampton Police.

### 1976

In the spring of 1976, plaintiff reapplied for Meter Patrol, was reinterviewed, and was turned down again. Her application reveals no information which has not already been discussed.

In the fall of 1975, Connor learned that plaintiff had worked at Hampton National Bank. He had seen plaintiff in the bank and inquired concerning her employment

because he was afraid, if the bank had employed her, that he might not have considered all of her qualifications. Mrs. Sandbold, the Branch Manager, told Connor that plaintiff had been slow at her work, that her supervisor had warned her that her work had not been adequate, and that plaintiff had come in and quit the next day. Connor learned that there had been some emotional outburst and that plaintiff had quit without notice.

Plaintiff had never mentioned her work at the bank in the 1976 job interview or her application.

Connor called Dr. Richard Hamilton, Superintendent of Schools, because plaintiff had indicated that she was a substitute teacher during the previous school year. Hamilton informed him that plaintiff had worked a total of five days.

Connor did hire an employee for Meter Patrol in 1976. The person he hired had been his assistant for seven years.

Connor also testified that he offered a job to a woman in 1975, but that the woman could not accept the job for personal reasons. The same woman applied in 1976, but Connor's previous assistant was deemed more qualified and filled the only job vacancy.

## OTHER WITNESSES

Mr. Attaya, the manager of J. & J.'s Sportswear, testified on behalf of plaintiff. His testimony reveals that she has been a superior employee at J. & J.'s Sportswear.

John Cole, plaintiff's current supervisor at Pawtuckaway State Park in Raymond, testified to plaintiff's performance of her current duties as a toll collector. He stated that she performed her job well and showed initiative in some of the assignments he had given her which were not strictly a part of her job as toll collector.

Mr. William Carpenter Supervisor for Park Operations for the Division of Parks, also testified concerning the job specifications and qualifications for a toll collector at a State park and for a Meter Patrol officer at Hampton Beach. The job specifications for a toll collector are set forth in Exhibit 24.

Although Cole testified that plaintiff performed her job well, it appears that the job of toll collector is not equivalent to the job of Meter Patrol officer, since it does not require the same degree of trustworthiness or the ability to perform without supervision.

## ANALYSIS

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court delineated the test for a prima facie case of discrimination in violation of 42 U.S.C. § 2000e.

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. In the instant case, we agree with the Court of Appeals that respondent proved a prima facie case. [8 Cir.] 463 F.2d 337, 353. Petitioner sought mechanics, respondent's trade, and continued to do so after respondent's rejection. Petitioner, moreover, does not dispute respondent's qualifications and acknowledges that his past work performance in petitioner's employ was "satisfactory."

The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire.

In this case, plaintiff belongs to a protected class, which satisfies the first requirement. There is no dispute that plaintiff applied for the job of Meter Patrol

officer. The job of Meter Patrol officer is not particularly different from the job performed by the myriad of meter maids who can be seen performing their jobs daily. This court takes judicial notice that no special education or skill is needed to perform the job of meter maid or Meter Patrol officer, and I find that plaintiff was qualified for the job for which she applied. Plaintiff was rejected despite her qualifications.

The fourth part of the *McDonnell* test was designed for a situation in which discrimination is alleged in the course of defendant's receiving seriatim applications. In the instant case, defendant selected employees from a pool of applicants. Therefore, I need not apply the fourth part of the *McDonnell* test.[1]

■ I rule that, in a case where employees are selected from a pool of applicants, and the first three parts of the *McDonnell* test have been proven, and where a prima facie case of discriminatory animus has been shown, it may be fairly presumed that the employer has failed to adequately consider the plaintiff's application. Therefore, when these elements have been established by the plaintiff

> [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

This holding is supported in *Gillin v. Federal Paper Board Company, Inc.,* 479 F.2d 97 (2d Cir. 1973). In *Gillin,* the plaintiff claimed that her employer's refusal to promote her constituted discrimination based solely on sex. The defendant admitted that she had not been considered for the job for which she applied, and that this failure to consider her application was based solely on sex.

While the ultimate prize was won by the male who had superior qualifications, this in our view does not purge Federal of its prior discriminatory act of refusing to consider her at all not *solely* because of lack of qualification but because she was a woman. While Gillin did not have all of the qualifications for the position, she fell clearly within the group entitled to initial consideration especially in a company which purported to have a policy of promoting from within. Having had some familiarity with and experience in most if not all the facets of the position, the refusal of Varsho to consider her because she was a woman, is clearly a mischief which the statute was designed to prevent. We hold therefore that the court below was in error in not considering this point and in assuming that Sweezey's superior qualifications presumably cured the previous act of discrimination. In sum we find no wrong in hiring Sweezey instead of Gillin but we hold that Federal did transgress by failing to consider Gillin not simply because she was not qualified but also because she was a woman. *Id.* at 102.

When Connor asked plaintiff if she could use a sledge hammer, he was displaying a discriminatory animus. His questions relating to the construction industry, which bears little or no relationship to the job of Meter Patrol officer, only serve to reinforce this court's view that Connor did not give plaintiff's application fair consideration, if he did, indeed, give it any consideration at all. Plaintiff has met her burden of showing a discriminatory animus on the part of Connor.

Were this not sufficient, Connor's admission that he told plaintiff she was first or second on the list adds considerably to plaintiff's proof. There was no cause for Connor to deliberately mislead plaintiff and hold out false hopes.

■ Defendant's claim that the job was given to an applicant with superior qualifications does not, by itself, relieve it of the necessity of showing that it did, indeed, give the plaintiff fair consideration. The alleged fact that defendant hired a superior applicant may well be some evidence of the defendant's good faith consideration of plaintiff; however, the defendant here did

---

1. *See McDonnell, supra,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817.

not give the plaintiff fair consideration. The Court in *Pond v. Braniff Airways, Incorporated,* 500 F.2d 161, 165–166 (5th Cir. 1974), stated:

> Of course it is true, as urged by Braniff, that where an employer can demonstrate no discrimination in the selection or advancement of employees, but rather that the employer in the best of faith merely weighed each person's talents then choosing the man over the woman (or the woman over the man), no case is made out under Title VII. But the inquiry does not necessarily stop here. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a female applicant are not simply a ruse disguising true discrimination. Courts must further carefully scrutinize the employer's explanations for its conduct once the aggrieved employee has proved a prima facie case of discrimination. . . . The line that must be drawn is a fine one—because interpreting an employer's motives on the basis of its actions is at times hazardous, especially when there exists potentially valid and seemingly plausible business explanations as to such actions which in fact mask a true intent to discriminate.

■ A crucial fact in this case is Connor's predisposition to hire fellow teachers, especially those from his own school. Availability for a summer job and experience with teenagers may be a part of the job, but plaintiff was available, and experience of this sort is hardly an essential element in what is one of the labor force's entry level jobs. In this case, the fact that plaintiff hired a teacher from Pentucket Regional School in 1974 for a job without written specifications only adds to plaintiff's contention that she was not given fair consideration. The fact that this discrimination is not protected by Title VII does not in any way detract from plaintiff's case.

In order to establish an "unlawful employment practice" or "unlawful discrimination" on the basis of sex within the intent and meaning of the "Law against discrimination," . . . it is not necessary that the sex discrimination be the sole reason for the employment practice under attack. If discrimination on the basis of sex played at least a part and was a causal factor in the failure of complainant to be given the job . . ., discrimination in violation of the statute has been established." *Harvard v. Bushberg Brothers, Inc.,* 137 N.J.Super. 537, 350 A.2d 65, 67 (1975). (Citations omitted.)

Defendant cites as controlling *Parham v. Southwestern Bell Telephone Company,* 433 F.2d 421 (8th Cir. 1970). In that case, the plaintiff alleged discrimination individually and as representative of a class. The plaintiff had been interviewed and tentatively offered a position with the defendant company. During the investigation of his past employment history, the defendant discovered that the plaintiff had an extremely poor employment record, and, as a result, withdrew its tentative job offer. That Court, in finding no individual discrimination, found that the plaintiff was rejected because of his qualifications. The Court found a good faith effort on the part of the defendant.

■ Here, I find no such good faith. I find that the defendant exhibited a discriminatory animus toward plaintiff and that his articulated reasons served merely as a cover for the discrimination which occurred at the consideration stage.

Therefore, I find that, in 1974 and 1975, defendant discriminated against plaintiff on the basis of her sex. I further find that, in 1976, defendant met his burden of articulating legitimate reasons for not hiring plaintiff. In 1976, plaintiff's veracity and trustworthiness were challenged by her failure to disclose her less than favorable employment experience at the local bank, giving defendant legitimate grounds for rejecting her application.

### FINDINGS AND RULINGS

1. Plaintiff complied with the filing requirements of 42 U.S.C. § 2000e and received the requisite statutory notice of right to sue by letter dated June 4, 1976,

from J. Stanley Pottinger, Assistant United States Attorney General.

2. For three successive summers, the summers of 1974, 1975, and 1976, plaintiff applied to Connor for a summer job as a member of the Hampton Beach Meter Patrol.

3. She was refused employment after personal interviews in all three years.

4. The Meter Patrol is a uniformed force employing approximately ten individuals during the summer months. They are not equipped with weapons or handcuffs.

5. The Hampton Beach Meter Patrol is responsible for maintaining over 1,500 State-owned parking meters and controlling vehicular parking at Hampton Beach.

6. Meter Patrol employees are responsible for checking parking meters for overtime violations, writing and processing violations and dealing with the public with respect thereto, arranging for towing of illegally-parked vehicles, and repairing damaged parking meters.

7. The essential duties of the Meter Patrol are: foot patrol of State-owned parking areas, ticketing vehicles for the purpose of enforcing parking laws, collection of coins from meters, and record-keeping in relation to these functions. Meter Patrol officers are not subject to close supervision in any of their activities; therefore, the position requires a relatively high degree of reliability and responsibility. The job also includes dealing with people of high school and college age.

8. There are not now, nor have there ever been, any female officers of the Meter Patrol.

9. James Connor, as Chief of the Meter Patrol, is primarily responsible for the hiring of personnel.

10. The State of New Hampshire does not maintain, and Connor does not apply, rigid eligibility criteria for employee selection.

11. Employees are selected by Connor on the basis of his evaluations of them, which are formulated from information provided in the applications, interviews, and his conversations with the references supplied by the applicants.

12. Connor has made it a practice to rehire the previous year's employees automatically, and to interview new candidates when a new position becomes available or when a vacancy occurs.

13. One vacancy for a position as Meter Patrol person existed for the summer of 1974.

14. In March, 1974, plaintiff filed a written application for a job as Meter Patrol officer with Connor.

15. Plaintiff was interviewed by Connor in the spring of 1974.

16. Plaintiff graduated from Tufts University, Medford, Massachusetts, receiving her B.A. degree in child study in June of 1974.

17. Plaintiff's work experience, at the time of her interview with Connor in 1974, included, in broad outline, the following: one semester of supervised student-teaching at the Elliot Pearson School in Medford, Massachusetts, in 1974; waitressing full-time at the Hollingsworth Motor Inn, Hampton Beach, New Hampshire, for about four weeks in the summer of 1973; waitressing full-time at the Lincoln House Restaurant, Hampton Beach, New Hampshire, for about seven weeks each in the summers of 1971 and 1972; waitressing full-time at Jerry's Restaurant for about three weeks in the summer of 1971; and working part-time as a grocery check-out clerk at Kings Supermarket, Orange, New Jersey, in 1970.

18. At the time of plaintiff's 1974 interview with Connor, plaintiff, having resided in Hampton for a number of summers with her family prior to becoming a permanent resident of the Town in June, 1974, was familiar with the Hampton Beach area and acquainted with some personnel of the Town of Hampton police force.

19. When plaintiff was interviewed by Connor in the spring of 1974, she was qualified for a position as Meter Patrol officer.

20. In 1974 and 1975, there were no written specifications for the job as Meter Patrol person.

21. In 1974, during his interview with plaintiff, Connor asked plaintiff whether she could wield a sledge hammer, and he indicated that the ability to do so was a qualification for the job as Meter Patrol officer.

22. The ability to use heavy tools was not a qualification for employment as a Meter Patrol officer in 1974 or 1975.

23. In 1974, during his interview with plaintiff, Connor asked whether plaintiff would be able to "run someone in" if this became necessary.

24. The ability to make an unassisted arrest was not a qualification for employment as a Meter Patrol officer in 1974 or 1975.

25. Connor's inquiries of plaintiff during her 1974 interview expressed discrimination based upon sex, without any *bona fide* basis for such discrimination.

26. Connor received a response from a former employer of plaintiff's to the effect that she had been unable to get along with people. Connor did not pursue the other employment references.

27. In May, 1974, William John Martin filed a written application for a job as Meter Patrol officer with Connor and was hired.

28. Martin's job credentials were superior to plaintiff's in the spring of 1974.

29. In 1974, Connor discriminated against plaintiff by failing to give her application fair consideration.

30. Martin's job qualifications were superior, and Connor would have hired Martin even had plaintiff been a man.

31. On March 21, 1975, plaintiff reapplied, by letter, for a position as Meter Patrol officer and furnished the names of her employers since the summer of 1974.

32. Two vacancies for a position as Meter Patrol officer existed in May, 1975.

33. On May 3, 1975, plaintiff was interviewed a second time by Connor for a position as Meter Patrol officer.

34. At the time of her May 3rd interview with Connor, plaintiff had additional work experience as a sales clerk at J. and J.'s Sportswear Co., Hampton Beach, New Hampshire, for about ten weeks in the summer of 1974; as sales clerk at Applecrest Orchards, Hampton Falls, New Hampshire, for about eight weeks in the fall of 1974.

35. At the time of the May, 1975, interview, plaintiff was qualified for the job of Meter Patrol officer.

36. At the time of the May 3, 1975, interview, plaintiff had been offered reemployment by J. and J.'s Sportswear Co. for the summer of 1975.

37. Plaintiff's employer, J. and J.'s Sportswear Co., was satisfied with plaintiff's work in the summer of 1974, and would have given a good reference, if contacted in May, 1975.

38. Connor did not contact J. and J.'s Sportswear Co.

39. In May of 1975, Connor checked one reference supplied by plaintiff and received a very positive response.

40. Plaintiff was not hired after the May 3, 1975, interview.

41. In May, 1975, Brian J. Liberty filed a written application with Connor for a job as Meter Patrol officer and was hired on May 10, 1975.

42. In May, 1975, Richard Jackman Ladd filed a written application with Connor for a job as Meter Patrol officer and was hired on May 10, 1975.

43. Brian J. Liberty's job credentials were not superior to plaintiff's in May, 1975.

44. Richard Jackman Ladd's job credentials were superior to plaintiff's in May, 1975.

45. Connor refused to hire plaintiff in May, 1975, due to her sex.

46. Plaintiff swore out her discrimination complaint with the New Hampshire Commission for Human Rights on May 1,

1975, prior to her May 3rd interview. It was filed subsequently. In it, she complained of alleged discrimination by Connor in both 1974 and 1975.

47. Plaintiff was invited to another interview in July of 1975, as a result of the creation of a new position.

48. There were two other persons interviewed for the new job, one a female and one a male.

49. At the time, Connor rechecked an employment reference, Jerry's Restaurant, and was told that plaintiff had been fired from the job due to unreliability. Connor attempted to contact two personal references, but was unsuccessful in making contact.

50. The male candidate was offered and accepted the position.

51. In July, 1975, Connor's failure to hire plaintiff was not based upon her sex.

52. Plaintiff filed a new application in 1976 and was interviewed.

53. There was a vacancy in the Meter Patrol for the summer of 1976.

54. Plaintiff's 1976 application contained one employment reference not contained in her previous applications. She stated that she was a substitute teacher in the Hampton School District, and that the position was "continuing."

55. Plaintiff did not reveal, on her 1976 application form, that she had been employed during September and October of 1975 by the Hampton National Bank.

56. On the day of plaintiff's 1976 interview, Connor knew that she had worked at the Seabrook Branch of the Hampton National Bank during September and October of 1975, and that she had quit the job.

57. During the 1976 interview, Connor asked plaintiff whether she had obtained employment other than that listed on her application, and her response was, "No."

58. Plaintiff was not hired in 1976. Connor hired a former Meter Patrol employee for the available position.

59. In 1976, Connor's failure to hire plaintiff was not based upon her sex.

### BACK PAY AND ATTORNEYS' FEES

Plaintiff is not awarded any damages for the year 1974, since I have found that, even if she had not been discriminated against, she would not have been hired for that year.

Connor's discrimination against the plaintiff did result in her not being hired in 1975, and she is to be awarded damages for that year: the amount she would have earned working on the Meter Patrol less the amount actually earned.

She is also entitled to damages on the same basis for the year 1976. Connor testified that he automatically rehired returning officers of the Meter Patrol. If plaintiff had been hired in 1975, she would have been rehired in 1976.

#### COMPUTATION OF DAMAGES

##### 1975

| | | |
|---|---|---|
| Amount earnable: Hampton Beach Meter Patrol | $3.52 | per hour |
| | × 40 | hours |
| | $140.80 | per week |
| | × 10 | weeks |
| | $1,408.00 | |

| | |
|---|---|
| Amount earned: J. and J.'s Sportswear Co. | 828.18 |
| Back Pay Damages | $579.82 |

##### 1976

| | |
|---|---|
| Amount earnable: Hampton Beach Meter Patrol | $1,408.00 |

| | |
|---|---|
| Amount earned: Pawtuckaway State Park | 1,155.52 |
| Back Pay Damages | $252.48 |
| Total Back Pay Damages— 1975 and 1976 | $832.30 |

42 U.S.C. § 2000e–5(k) provides:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

Judgment for the plaintiff in the amount of $832.30 plus attorneys' fees in the amount of $1,500.

SO ORDERED.