Yvonne G. TROUT, et al., Plaintiffs,

v.

Edward HIDALGO, et al., Defendants.

Charlene HARDY, Plaintiff,

v.

Edward HIDALGO, et al., Defendants.

Marie Louise BACH, et al., Plaintiffs,

v.

Edward HIDALGO, et al., Defendants.

Yvonne G. TROUT, Plaintiff,

v.

Edward HIDALGO, et al., Defendants.

Civ. A. Nos. 73–55, 76–315, 76–1206, 78–1098.

United States District Court, District of Columbia.

April 16, 1981.

Bradley G. McDonald, W. Peyton George, Washington, D.C., for plaintiffs in all cases.

Sarah C. Carey, Washington, D.C., for plaintiff in No. 78–1098.

William H. Briggs, Jr., Asst. U. S. Atty., Washington, D.C., for defendants in all cases.

OPINION

HAROLD H. GREENE, District Judge.

These four consolidated cases raise individual and class sex discrimination claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.[1] The defendants in all of these actions are officials of the Department of the Navy and an agency of the Department of the Navy formerly referred to as the Naval Command Support Activity (NAVCOSSACT) and, since March, 1977, as the Navy Regional Data Automation Center (NARDAC).[2]

NAVCOSSACT was established in 1962 as the center of Navy computer operations

---

1. Although plaintiff Bach, in Civil Action No. 76–1206, also asserts a claim under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a (1974), plaintiffs did not argue this claim in their trial brief and the statistical evidence at trial was devoted exclusively to sex discrimination. By order filed December 13, 1976, the Court struck the claims for relief involving individual disciplinary action.

2. For the sake of simplicity, both of these agencies as well as the several individual defendants are generally hereinafter referred to as NARDAC.

for national defense purposes. The organization grew from about 250 employees in 1962 to one employing over 1,000 individuals in the late 1960's. By the early 1970's, however, lesser United States involvement in foreign conflicts and fiscal restraints placed upon the agency resulted in a reduction in the size of the organization, and consequently fewer high-grade employees were authorized and fewer promotions occurred. In 1977, NAVCOSSACT was dissolved in the course of a reorganization of the Navy's automated data processing activities (ADP), and its personnel and resources were combined with personnel and resources of the Navy Material Command Support Activity, the Navy Accounting and Finance Center, and the Naval District Washington, D.C., to form NARDAC. NARDAC develops computer systems and documents for computer systems, trains personnel in the operations of systems, and delivers the systems to user organizations.

Plaintiffs Yvonne G. Trout and Clara Perlingiero, both computer systems analysts, brought the first of the currently-pending actions, Civil Action No. 73–55, and they are also the representatives of the class previously conditionally and now fully certified in that case consisting of "all female professional technical employees employed by [NAVCOSSACT] or [NARDAC] at any time between June 6, 1972, and June 4, 1979." Trout is also the plaintiff in Civil Action No. 78–1098, in which she alleges retaliatory actions arising from her initial claim. Charlene Hardy, the plaintiff in Civil Action No. 76–315, is a retired computer programmer from NARDAC and a member of the designated class. Marie Louise Bach, a NARDAC security manager, and Joan Swann Creighton, director of the NARDAC Training Department, are the plaintiffs in Civil Action No. 76–1206, but they are not members of the class.

I

The class action aspects of this lawsuit involve an alleged pattern and practice of sex discrimination in defendants' hiring, performance evaluation, job assignment, promotion, and award procedures. Their resolution revolves primarily around the statistics submitted by the parties and the analysis of those statistics by the parties' experts.[3] As might be expected, the evidence adduced by plaintiffs in these areas differs sharply from that advanced by defendants. Moreover, as will be explained below, neither analysis is wholly free from defects or ambiguities. Some of these problems are attributable to the underlying data (see note 4 infra) while others are to a degree inherent in the various methods of analysis (see, e. g., 884 infra) which almost inevitably required those performing them to make trade-offs in terms of inclusiveness and specificity. On balance, however, for the reasons indicated below, the court finds plaintiffs' statistical proof to be the more reliable.

That proof consists essentially of multiple regression analyses of raw statistical data furnished to plaintiffs by defendants in the course of discovery.[4] Multiple regression is a statistical technique designed to estimate the effects of several independent variables on a single dependent variable. Properly

3. However, as discussed in Part IV infra, testimony concerning actual personnel practices was also adduced on the class action issues.

4. The data used by both parties' experts for statistical analysis consisted of a computer tape and a computer printout furnished to plaintiffs by defendants in response to an interrogatory. The tape included eighteen recent job actions taken with respect to each employee from 1970 to 1979, as well as the employee's age, sex, date of entry in federal service, date of hire by, and departure from, NARDAC, and the prior employing agency. The printout included age, sex, educational level, date of entry in federal service, date of hire by NAVCOSSACT, and all job actions between 1972 and 1977. These data, from which all subsequent analyses were derived, were first requested by plaintiffs on May 9, 1980, five weeks before the trial began. Some of the deficiencies in the parties' statistical analysis can be traced directly to certain gaps in these two sources of data. Had either party focused its attention earlier on the critical role statistical analysis would play in the proof of this case, it might have been possible to obtain and analyze the personnel records themselves as a basis for more accurate determinations.

used in a case such as this, the methodology provides the ability to determine how much influence factors such as sex, experience, and education each have had on determining the value of a variable such as salary level.[5] The analysis also enables an observer to cumulate effects of the various factors so as to determine the degree to which explanation of the dependent variable can be attributed to the independent variables in combination.[6] Regression analysis is well recognized by the literature and the courts in Title VII litigation.[7]

Plaintiffs' expert[8] began his analysis with the undisputed fact that the average salary for female employees at NARDAC has throughout the relevant period been considerably lower than that of males. At the beginning of that period, in 1972, women earned $2,700 less than men, that is, 82 percent of the male salaries; at the end of the period, in 1979, women earned $4,300 less than men, or 84 percent of the male salaries.[9] The salary differentials throughout this period reflect the relative concentration of women in NARDAC in the lower civil service grade levels. During that period, women constituted about 20 percent of the NARDAC labor force. They were consistently overrepresented in the lower grades, with their share varying between 21 and 50 percent for GS–7 through GS–11 and between 42 and 100 percent for GS–5, and they were with equal consistency underrepresented in the upper grades, where they occupied between 3 and 10 percent of the jobs at GS–14 and above. In the middle positions there also was a contrast, although it was less stark. Women held approximately 24 percent of the GS–12 positions, and about 10 percent of the GS–13 positions.

With these salary differentials clearly established, plaintiffs' expert sought to determine next, on a year-by-year basis between 1972 and 1979,[10] whether the disparity could be accounted for by differences between men and women in education and experience,[11] or whether it was more likely to be attributable to sex discrimination. To accomplish this analysis, the expert witness specified for regression a linear model which included dummy variables for level of education,[12] years of NARDAC service, years of other government employment service, years of potential nongovernment experience between date of receipt of last educational degree and date of entry in

5. See Fisher, Multiple Repression in Legal Proceedings, 80 Colum.L.Rev. 702, 721–25 (1980).

6. The best measure of the degree of explanation of movement of the dependent variable by the model is known as $R^2$. A value for $R^2$ of 1.0 represents total explanation; zero indicates no explanation.

7. See, e. g., Presseisen v. Swarthmore College, 442 F.Supp. 593 (E.D.Pa.1977), aff'd, 582 F.2d 1275 (3rd Cir. 1978); Agarwal v. McKee and Co., 16 E.P.D. ¶ 8301 (N.D.Cal.1977); Wade v. Mississippi Cooperative Extension Service, 528 F.2d 508, 514 (5th Cir. 1976); Pennsylvania v. Local 542, Operating Engineers, 469 F.Supp. 329, 19 E.P.D. ¶ 9028 (E.D.Pa.1978); Finkelstein, The Judicial Reception of Multiple Regression Studies in Race and Sex Discrimination Cases, 80 Colum.L.Rev. 737 (1980); Note, Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal, 89 Harv.L.Rev. 387 (1975); Fisher, supra note 5.

8. Plaintiffs' principal expert was Mahlon R. Straszheim, Ph.D., a professor of economics at the University of Maryland.

9. The relative decrease in the percentage gap when compared to the increase in the dollar gap is accounted for by inflation.

10. No regression was run for 1978.

11. Experience and education were largely determinative of salary at NARDAC. In 1972, for example, each year of service at the agency tended to increase the salary level by $1,209, each year of service at other federal agencies by $194, and each year of "nonfederal service" by $152. Employees with graduate degrees tended to receive $3,788 more than those with no college experience.

12. The 1979 regression model did not include education variables because education data were unavailable. Plaintiffs' expert reported that this alternative specification altered the magnitude of the sex coefficient only slightly and did not change the statistical significance of the coefficient.

federal service, and sex.[13] The dependent variable was salary.

When prior experience and education were thus taken into account, female employees still received substantially lower salaries than men, the yearly differential attributable to sex ranging from $2,200 to $3,500.[14] Since there never was any suggestion by the government that factors other than education or experience could legitimately account for the differences,[15] the Court would clearly have been justified, absent some explanation, to draw the conclusion that equally qualified female employees of NARDAC consistently received lower salaries on the average than male employees and, accordingly, that they had been the victims of improper discrimination.

## II

The government's answer to plaintiffs' statistical case was two-fold. It argues initially that various defects in the analysis renders its ultimate conclusions unreliable and that, inasmuch as plaintiffs have the burden of proof, this unreliability demands that judgment be entered against them. Additionally, the government presented statistical evidence through its own experts, arguing that, even if plaintiffs' statistical analysis were deemed to constitute a prima facie case, that case was adequately rebutted by the government's statistical findings. The Court considers each of these arguments in turn.

**13.** For a discussion of the problems surrounding the accuracy of the experience and education factors used by plaintiffs, see Part III *infra.*

**14.** Women received $2,271 less than men in 1972, $2,189 less in 1973, $3,437 less in 1974, $2,547 less in 1975, $2,885 less in 1976, $3,106 less in 1977, and $3,109 less in 1979. These differences in salaries were statistically significant at the .01 level, that is, they would be expected to arise by chance less than one percent of the time if there were no discrimination based on sex. In each regression, all of the other variables showed up as significant at the .01 level, with the exception of the dummy variables for college. The $R^2$'s, representing the explanatory fit of the model overall range from .42 to .64. Plaintiffs' expert also performed several variant regressions, including running of the 1979 model using a population of employees hired only since 1972, when Title

The government's objections to the reliability of plaintiffs' statistically-based conclusions may be summarized as follows. First, it is claimed that plaintiffs' expert improperly permitted pre-1972 statistical evidence and evidence of other agencies' actions to intrude into his analyses. In this regard, defendants assert that the inclusion of individuals hired before 1972 (when Title VII was not applicable to federal employees) and of individuals who transferred from other federal agencies (whose salaries were presumably already predetermined) would inappropriately subject the defendants to liability for actions that either were not legally cognizable when they occurred or were attributable to agencies other than NARDAC. Second, defendants argue that plaintiffs' expert failed to include in his analysis several relevant factors and that for this reason the coefficient suggesting discrimination was biased. And third, it is contended that the experience factor used by plaintiffs' expert, who included as experience the entire period between completion of education and hiring by the government, reflects not so much actual experience as merely age.

█ A. Defendants' objection to the failure of plaintiffs' expert to eliminate all pre-1972 data is not as persuasive as might appear at first blush. Although discriminatory conduct which occurred solely prior to

VII became applicable to federal employees; running of the 1979 model using subpopulations categorized by agency origin within NARDAC; and running of data for both 1977 and 1979 using a logarithmic, rather than a linear, equation. Each of these variants produced statistically significant results which were wholly consistent with those of the basic model. The expert finally offered evidence to show that women were treated less favorably than men in grade level placement in hiring and promotion decisions. Because this evidence merely amounted to a repetition of evidence already built into the regression conclusions, and was substantially less probative than the regression analysis, the Court has not considered it on an independent basis.

**15.** See note 11 *supra;* but see also 879–881 *infra.*

March 24, 1972, is not directly actionable in Title VII suits against the federal government,[16] it has been recognized that evidence of such conduct can

> in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change.[17]

Between 1967 and 1972, NARDAC engaged in a number of practices which unfairly discriminated or had the strong potential to discriminate against women— among them the conducting of evaluations of employees on a subjective basis by male supervisors; [18] the failure to advertise promotion opportunities; and the preselection of male employees for higher level positions by male supervisors. It is likely that such discrimination before 1972, even if coupled with neutral employment practices since then, produced actionable continuing discriminatory effects after 1972, particularly since Civil Service regulations patterned after the so-called Whitten Amendment (5 C.F.R. § 300.602 (1968); P.L. 253, 82d Cong., 1st Sess. (1951)), constrained the maximum allowable rate of grade promotion.[19] Under these circumstances, it was appropriate for plaintiffs' expert not to exclude completely the effects of pre-1972 conditions.[20]

■ With regard to defendants' objection that plaintiffs included employees who transferred from other agencies with "predetermined grades and salaries," NARDAC did not make a convincing showing that it had no control over initial grade determinations.[21] Although the agency was, of course, entitled to attempt to demonstrate in its own statistical analysis that if grade placement decisions by other agencies were excluded no vestige of discriminatory results would remain, the Court could not appropriately dismiss plaintiffs' own analytical conclusion upon that basis. The logical product of defendants' theory would be a requirement that plaintiffs in Title VII cases must join as defendants all govern-

**16.** *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

**17.** *Hazelwood, supra,* 433 U.S. at 309 n. 15, 97 S.Ct. at 2742 n. 15. For example, on that basis, if promotion decisions within the period of legal responsibility indicate an adverse impact on a protected group, but there is too small a sample within that period on which to base a finding of statistical significance, the data for earlier periods may be aggregated with the information for more recent periods. See Finkelstein, *supra* note 7, at 746; *Vera v. Bethlehem Steel Corp.,* 448 F.Supp. 610, 615 (M.D.Pa. 1978); *Parson v. Kaiser Aluminum and Chemical Corp.,* 575 F.2d 1374, 1385, *rehearing denied,* 583 F.2d 132 (5th Cir. 1978); *Patterson v. Youngstown Sheet and Tube Co.,* 440 F.Supp. 409, 411–13 (N.D.Ind.1977).

**18.** All of the department and division heads and other management officials at NARDAC (with the exception of one black male) were white males. Of the approximately 215 to 220 project leaders, only 6 were women. See *Rowe v. General Motors Corp.,* 457 F.2d 348, 358–59 (5th Cir. 1972); *Ste. Marie v. Eastern Railroad Ass'n,* 458 F.Supp. 1147, 1162 (S.D.N.Y.1978); *Neely v. Grenada,* 438 F.Supp. 390, 407–08 (N.D.Miss.1977); *Stastny v. Southern Bell Tel. & Tel. Co.,* 458 F.Supp. 314, 345–46 (W.D.N.C. 1978); *Kyriazi v. Western Electric Co.,* 461 F.Supp. 894, 923 (D.N.J.1978).

**19.** The situation is analogous to the effect of racial discrimination by labor unions that is succeeded by use of neutral seniority rules, or of discriminatory voting registration practices followed by neutral, but particularly arduous, requirements. In such cases, courts have not hesitated to hold that "freezing" the effects of prior discrimination is actionable. See, *e. g., United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 450–51 (5th Cir. 1971); *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505, 516 (E.D. Va.1968); *United States v. Dogan,* 314 F.2d 767, 772–73 (5th Cir. 1963).

**20.** No practical method of separating the effects of pre-1972 and post-1972 discrimination in regression analysis was suggested by defendants or is readily apparent. See *Segar v. Civiletti,* 508 F.Supp. 690, at 697 (D.D.C.1981). Plaintiffs did perform one regression including solely employees hired after 1972 and found statistically significant discrimination in salaries. That study, however, was not a suitable replacement for broader regressions, if only because its exclusion of long-time employees precluded analysis of promotion practices in higher grades.

**21.** See 885–886 *infra,* for a discussion of the issue regarding NARDAC's liability for initial grade determinations, which in significant respects also applies to transferees.

ment agencies from which any employees ever transferred—a proposition which suggests that the objection is not compelling.[22]

■ B. The other objections made by defendants to plaintiffs' statistics essentially raise legal issues relating to the burden of proof. Certainly, plaintiffs' expert did not, in his analysis, account for each of the factors that the government suggests should have been considered. It is also true that a model which incorporated additional potentially relevant factors (such as type or quality of education and experience) would form a more perfect foundation for determinations regarding allegations of discrimination. However, defendants have furnished no evidence that inclusion of the missing variables or refinement of others would have altered rejection of the hypothesis of no discrimination. Indeed, they failed to offer any evidence indicating that type of education and experience or quantity of experience per age was distributed unequally among the women and men in the NARDAC population.

To be sure, defendants did suggest that technical, computer-related education and experience are not equally distributed in the general population between men and women,[23] and they have also argued that women are more likely than men to leave the labor force to raise children, and, hence that on the average they possess less expe-

rience per age than men. However, the generalities offered by lay witnesses on these subjects are inadequate, by themselves, to undermine plaintiffs' analysis. Certainly, the Court would not be justified in accepting mere sex stereotypes as an adequate rebuttal. What was required in this circumstance was substantial, expert supporting evidence keyed to the population here involved, but such evidence was not forthcoming. See *Vuyanich v. Republic National Bank*, 505 F.Supp. 224 (N.D.Tex. 1980).·

C. Thus, the basic question is—have the plaintiffs satisfied their burden of proof by adducing the type of statistical evidence that they did, or were they affirmatively and as part of their own case required to do more?[24]

■ Under current law, a plaintiff has the burden of establishing a prima facie case of sex discrimination under Title VII.[25] In class action litigation under that statute, statistics often play an important role in both parties' claims regarding the existence of discrimination.[26] Indeed, statistics alone may suffice to establish a prima facie case.[27] As the Supreme Court made it clear in *Hazelwood School District v. United States, supra*, 433 U.S. at 307–08, 97 S.Ct. at 2741–42,

[w]here gross statistical disparities can be shown, they alone may in a proper case

---

**22.** A court recently dealt with the identical issue by assuming that, in the absence of evidence to the contrary, transferor agencies and transferee agencies discriminated equally. See *Segar v. Civiletti, supra*, 508 F.Supp. at p. 699 n. 4.

**23.** Census data were submitted in support of this proposition.

**24.** In an ideal world, all of the necessary proof would be fully available, and the decision could then be said to be based on correctness to a scientific or mathematical certainty. However, in an actual trial context, the Court must, absent unusual circumstances, make its decision on the basis of what evidence has been presented.

**25.** Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff in a Title VII case has the burden of establishing a prima facie case; the

defendant may then rebut the prima facie case by demonstrating legitimate business reasons for the apparent discrimination; and plaintiff may then attempt to show that the reasons given amount to a pretext. See *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**26.** See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

**27.** *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *United States v. International Union of Elevator Constructors, Local No. 5*, 538 F.2d 1012, 1015 n. 6 (3rd Cir. 1976); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 259 (3rd Cir. 1975); *Davis v. Califano*, 613 F.2d 957 (D.C.Cir.1979).

constitute prima facie proof of a pattern or practice of discrimination.[28]

■ As indicated, parties in complicated Title VII actions are increasingly using multiple regression analysis, such as that conducted in the instant case, to separate the phenomenon of discrimination from a myriad of innocent interacting factors.[29] While such analysis can assist significantly in making the refined and sophisticated judgments required,[30] it would be erroneous to impose upon the party relying upon this technique the burden of incorporating every conceivable refinement and disproving every contingency. As Professor Finkelstein has pointed out,[31]

[i]n criticizing models it is possible to speculate endlessly that different data, forms of equation, or explanatory variables would yield significantly different and superior results. Compelling definite

calculations will bring such easy speculation down to earth.[32]

In the case at hand, plaintiffs used regression analysis to attempt to eliminate such possible explanations for the salary differentials as educational and experience factors. They succeeded in doing so to a substantial extent. The government argues, in essence, that because plaintiffs did not refine the variables in their regression to an absolute degree, they failed in meeting the required burden of proof. The Court declines to impose upon Title VII plaintiffs so impractical a requirement.

This conclusion is especially compelling when, as here, the deficiencies in plaintiffs' statistical proof may to a substantial extent be attributed to the defendants. In the course of discovery, plaintiffs requested NARDAC's computerized personnel records describing employees' grade, salary, promotion, training, job performance, education,

**28.** Where racial or sex-based disparities are particularly gross, plaintiffs have often relied on mere percentage differentials between the work force and the general population to base a claim of discrimination (see B. Schlei and P. Grossman, *Employment Discrimination Law*, 332 nn. 80–82 (1979 Supp.), although, as the Supreme Court pointed out in *Hazelwood, supra*, 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13, such comparisons are only highly probative when skills required for the job are ones "that many persons possess or can fairly readily acquire." Some courts have also allowed such data to be used for skilled or managerial positions, but more generally plaintiffs alleging discrimination in non-entry-level jobs have been required to produce statistical evidence comparing the composition of the work force with the makeup of the segment of the population possessing the qualifications relevant to the jobs at issue. See Schlei and Grossman, *supra*, at 322–23 nn. 83–84, 86–90. Similarly, when the focus of the suit is alleged discrimination in promotion decisions, some courts have held that evidence of a disparity in the composition of entry-level jobs relative to upper-level jobs constitutes a prima facie case, while others have required that plaintiff compare only those entry-level jobholders demonstrably qualified for promotion with employees holding high positions. See *id.* at 324–25 nn. 92–93.

**29.** "Multiple regression is well suited to [distinguish sex discrimination from differences in qualifications such as education and experience] fairly precisely. Moreover, without a multiple regression study it is difficult to see how it could be decided. The raw comparison

of average wages for women and for men may make one suspicious, but it cannot tell one anything definite." Fisher, *supra* note 5, at 721.

**30.** The Court does not interpret *Movement for Opportunity v. General Motors Corp.*, 622 F.2d 1235 (7th Cir. 1980), which is heavily relied upon by defendants, to the contrary. In that case, in which the court found defendants' work force "flow" statistics more probative on the issue of discrimination than plaintiffs' statistics, plaintiffs merely compared work force percentages with potential work force composition figures and did not perform any regression analysis. On the basis of that evidence, moreover, the court held that plaintiffs had made a prima facie showing, albeit one that defendants adequately rebutted.

**31.** Finkelstein, Regression Models in Administrative Proceedings, 86 Harv.L.Rev. 1442, 1466 (1973).

**32.** Judge Robinson of this Court recently adopted this same position in *Segar v. Civiletti, supra*, when he held, at p. 712, that

[w]hen a plaintiff submits accurate statistical data, and a defendant alleges that relevant variables are excluded, defendant may not rely on hypothesis to lessen the probative value of plaintiff's statistical proof. Rather, defendant, in his rebuttal presentation, must either rework plaintiff's statistics incorporating the omitted factors or present other proof undermining plaintiff's claims.

and prior employment experience, among other information. Defendants replied that much of the information was unavailable, and they furnished instead a computer tape which provided only the data used by plaintiffs' expert in preparing his statistical analysis. To be sure, plaintiffs' request was made relatively late in the history of this long-pending litigation. Nevertheless, plaintiffs cannot legitimately be faulted for gaps in their statistical analysis when the information necessary to close those gaps was possessed only by defendants and was not furnished either to plaintiffs or to the Court.[33]

D. Defendants rely to the contrary principally upon two cases in which courts have criticized regression analyses.

In *Agarwal v. McKee and Co.*, 16 E.P.D. ¶ 8301 (N.D.Cal.1977), the plaintiffs sought to support their claims of racial discrimination with a multiple regression, but the Court refused to credit the findings of discrimination, citing that their failure to include variables representing types of education and types of experience. In the view of that court, regressions which aggregate individuals of all positions, and which treat "all job positions as fungible, involving equal levels of knowledge, skill and responsibility" are invalid. 16 E.P.D. at 5581. In the instant case, all members of the class are professional technical employees with generally similar job skills, and it is not at all clear that the *Agarwal* ruling would be pertinent here.[34] In any event, the Court does not agree with the view that an aggregation across job lines necessarily destroys the probative value of regressions. Absent a demonstration that such an aggregation imports a bias into the conclusions, the methodology is not inappropriate. Indeed, as is discussed in more detail below, the technique is superior to methods which entail a fragmentation into populations so small that statistical analysis loses much of its power to find any discrimination.[35] To the extent that *Agarwal* may be read as suggesting that type and quality of education and experience must always be included in a valid statistical model proposed by a Title VII plaintiff, it appears to be simply wrong and has for that reason been justly criticized. In the words of Professor Finkelstein,

> The failure to code type or quality of prior experience or education should more properly fall on the employer than on the plaintiff, since such coding would be relevant only to the extent the employer could demonstrate that differences in type of education or prior employment experience were validly related to the requirements of the job.[36]

---

**33.** See *Donnell v. General Motors Corp.*, 576 F.2d 1292, 1297 (8th Cir. 1978); *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55, 80 n. 27 (E.D.Pa.1977), *rev'd on other grounds*, 582 F.2d 827 (3rd Cir. 1978). One clear purpose of discrimination law is to force employers to bring their employment processes into the open. See Note, *Employment Testing: The Aftermath of Griggs v. Duke Power Company*, 72 Col.L.Rev. 900, 908 (1972).

**34.** A position similar to that taken by the court in *Agarwal* was also expressed in a recent decision of Judge Gasch of this District. See *Valentino v. United States Postal Service*, 511 F.Supp. 917 at 957 (D.D.C.1981). Defendants' reliance upon that case in this context is likewise misplaced, and for similar reasons. The class in that action included "economists, computer experts, business managers, personnelists, engineers, statisticians, lawyers, accountants, and secretaries." At p. 940. The instant case, of course, involves no such aggregation of disparate occupations.

**35.** Defendants' response to plaintiffs' expert's objection to the aggregation by year only in defendants' promotion analysis was that the most accurate analysis would have been to disaggregate by each separate promotion decision. See Defendants' Post-Trial Brief Regarding Statistics pp. 10–11 n. 4. Although defendants are correct that no inaccuracies are introduced by such disaggregation, it is also true that no comparative information is generated until individual cases are aggregated. The cost of following defendants' suggestion seems inordinately high.

**36.** Finkelstein, Judicial Reception, *supra* note 7, at p. 744. It may be noted, too, that the court did not hold that the plaintiffs had failed to meet their burden of proof but merely that they did not adequately refute defendant's presentation of legitimate nondiscriminatory reasons for its conduct.

884

In *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (E.D.Pa.1977), *aff'd*, 582 F.2d 1275 (3rd Cir. 1978), both parties conducted sophisticated regression studies to buttress their contentions regarding the practice of sex discrimination in faculty employment decisions. The court in that case found that neither side had adequately supported its own regression analysis, and in that posture it saw only two basic alternatives: to ignore both sets of statistical analysis or to consider both studies as if they suffered no defects. After concluding that it did "not believe that the statistics give rise to any inference whatsoever," it held that plaintiffs had not made out a prima facie case. That conclusion, however, must be viewed in the peculiar context in which it arose. The action was brought by faculty members at a liberal arts college, and the court's decision necessarily was colored by the fact that it is difficult to quantify and thus to incorporate into a regression analysis such factors as scholarship, teaching ability, and the like which play a predominant role in employment decisions at such an institution.[37] The instant case does not to the same degree involve factors of such elusiveness. Moreover, defendants here did not offer their own regressions to correct the deficiencies they complained of in plaintiffs' analysis.[38]

For the reasons stated, the Court rejects the various objections proffered by the government and it concludes that, based upon the statistics, plaintiffs have established a prima facie case of sex discrimination in initial grade placement and promotion against the class of professional technical women employed at NARDAC.

### III

■ To rebut this prima facie case, the government, through its experts,[39] introduced its own statistical evidence. This evidence, based essentially upon the same data as that used by plaintiffs, consisted of a so-called cohort analysis and various independent regressions.[40]

A. The cohort analysis examined the flow of male and female employees of the same grade level through NARDAC's promotional system. The experts divided the work force into groups by the year in which the employees joined the agency and the GS grade at which they entered. The promotion experiences of each of these groups or "cohorts" over time were examined to compare the relative progress of men and women. On the basis of this analysis, the government's experts concluded that NARDAC's promotion system had not had any disproportionately adverse impact on female employees.

Although defendants' statistics did support that conclusion, several defects inherent in their use of the statistics severely mitigate its force.[41]

First and foremost, the cohort analysis necessarily divided the population under examination into extremely small segments or groups.[42] As population size decreases, a disparity must be increasingly large to be statistically significant, for the division of observations into small groups necessarily

---

**37.** See also, *Marimont v. Califano*, 464 F.Supp. 1220, 1227 (D.D.C.1979); Finkelstein, *supra* note 7, at p. 744.

**38.** See 886–887 *infra*, for a discussion of the regressions defendants did conduct.

**39.** Defendants' experts were Peter Lewin, Ph.D., assistant professor of economics, University of Texas at Dallas; and Robert R. Hill, Ph.D., assistant professor, Texas A&M University.

**40.** Defendants also offered a promotion analysis to refute allegations of discriminatory promotion practices. However, because this analysis suffers from a number of the same defects

that limit the probative value of defendants' other statistical analysis (such as excessive disaggregation and inability to reflect discrimination in hiring, see *infra*) and is inherently less probative than regression analysis (see pp. 877–878, 882 *supra*), it does not significantly assist defendants.

**41.** In a similar situation, it has been said of cohort analysis (*Segar v. Civiletti, supra*, at p. 712), that it "was irreparably flawed . . . and is devoid of probative value."

**42.** For example, many of the cohorts contain only two, three, or four employees.

reduces the detectable level of significance. See *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 340, 97 S.Ct. at 1856; *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333–34, 39 L.Ed.2d 630 (1974); *Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal,* 89 Harv.L.Rev. 387, 417–18 (1975). The failure of the government's analysis to reject, in many instances, the hypothesis of no discrimination in promotions is in large measure attributable to the fact that it selected a statistical method with extraordinarily low power to detect sex-based disparities.

Second, the analysis does not include any cohort which was composed solely of men or solely of women.[43] As a result, 15 percent of the women and 38 percent of the men were excluded from the analysis,[44] again severely restricting the usefulness of any conclusions drawn from data.

Third, the analysis conducted by defendants' experts assumed that the employees studied were placed in an appropriate salary grade at the outset, and it therefore could not and did not detect any bias in the hiring and placement process.[45] The government appears to justify this ignoring of possible discrimination in initial placement with the argument that NARDAC had no influence on placement decisions, which were allegedly completely controlled by the Civil Service Commission, and that NARDAC therefore would not be legally liable for any bias at time of hiring. However, whatever may have been the formalistic Civil Service classification system, defendants failed to demonstrate that NARDAC had no influence on initial grade placement decisions. In fact, the interplay among job description, assignment to positions, distribution of duties, and classification standards leaves ample room for flexible treatment and hence for variation and discrimination. See also, e. g., 880 *supra* and note 67 *infra.*

Furthermore, even if all authority for improper initial grade placement were assumed to rest with the Civil Service Commission, the resulting disparities in grade level remaining over several years could still be properly attributable to NARDAC. In such a case, either NARDAC failed to promote equitably individuals who were discriminated against at hiring (which would constitute direct discrimination by NARDAC) or operation of the Whitten Amendment regulations locked in the effects of the earlier discrimination (see 880 *supra*). In either event, the assumption implicit in defendants' statistics that discrimination in initial placement is irrelevant to the case is incorrect and undermines their analysis.

Fourth, defendants' cohort analysis did not take into account pre-1972 discrimination. Yet, although the government bears no legal responsibility *per se* for pre-1972 actions, as indicated *supra* (879–880) such actions should have been considered to the extent that they continued to affect post-1972 salary levels.[46]

---

**43.** Such cohorts are necessarily excluded, because there is no way to make a comparison between men and women for a cohort with employees of only one sex.

**44.** Defendants offered no evidence that the exclusion of these employees did not bias their conclusions.

**45.** For example, a male high school graduate and a female with an advanced degree who were hired improperly at the same grade in a particular year would, under the cohort method, continue to be inappropriately studied as if they always belonged at the same grade level. Moreover, if the woman subsequently were ever promoted more rapidly than her male counterpart, her case would be counted as evidencing discrimination in favor of, rather than against, women.

**46.** Defendants point to two recent decisions as sustaining contrary conclusions. In *O'Brien v. Sky Chiefs, Inc.,* 23 FEP Cas. 65 (N.D.Cal. 1980), cohort analysis was used to controvert allegations of sex discrimination. But in that case the statistical evidence adduced by the plaintiffs consisted only of percentage disparities in rank, and the court quite properly granted summary judgment to defendants, after finding that neither party's evidence contradicted the other's and that plaintiffs had not made out a *prima facie* showing of discrimination. In the instant case, by contrast, the statistical evidence is conflicting, and the Court has al-

Because of the deficiencies described above, the Court finds defendants' cohort analyses to be insufficiently reliable to rebut plaintiffs' case.

B. The remaining statistical evidence offered by defendants consisted primarily of regression analysis. Again, there were several shortcomings with the presentation of these studies, each of which is independently sufficient to render them inadequate to rebut plaintiffs' prima facie case of discrimination.

■■■ As pointed out above, defendants did not choose to perform any regressions correcting the specification errors they claimed afflicted plaintiffs' regressions. In an employment discrimination case, in which the defendant employer has the greatest access to potentially relevant employment data, the burden is on it to produce and use such data in developing its statistical case (see 882–883 supra). Defendants' failure to include the variables of type of education and experience and a more accurate measure of quantity of experience in their regressions must be interpreted as a concession that these refinements in the specification of the model would not have affected the rejection of the hypothesis of no discrimination.

■■■ Further, several of the regressions defendants did perform were not themselves offered as evidence. Instead, defendants relied on a few sparse sentences of descriptions of regressions allegedly performed, claiming that they revealed no unfavorable treatment of women. The cursory nature of the support for this conclusion, in four consolidated cases in which seven years of litigation have generated thousands of pages of documentation and argument, requires the Court to assign little probative weight to this finding.[47]

■■■ Finally, the regressions that defendants both performed and offered into evidence with enough specificity to be entitled to consideration are inadequate to rebut plaintiffs' case. Defendants regressed the log of salary on the education, experience, and sex of NARDAC employees who had been hired since 1972 and who had not transferred from other government agencies. As noted supra, for various reasons, including the use of small populations necessitated by the restrictions upon the employees included by defendants, the power of the analysis to detect sex discrimination was significantly eroded.[48] The Court therefore concludes that these regressions are entitled to little weight.

For all of the above reasons, the Court finds that defendants' evidence has not "raise[d] a genuine issue of fact as to whether [they] discriminated against the

---

ready concluded that plaintiffs have proved a prima facie case.

Judge Gasch of this Court, in *Valentino v. U. S. Postal Service, supra,* entered judgment for defendant after a trial that included complicated statistical evidence. In that case, as in this one, plaintiffs produced multiple regression analyses as part of their prima facie case, and defendant offered cohort analyses and regressions in rebuttal. Some of the factors leading the Court there to conclude that defendant's statistical evidence was more probative than plaintiffs', such as improper aggregation of disparate occupations, are not present here. Beyond that, this Court respectfully differs with a number of other conclusions reached in that case: *e. g.,* the appropriateness of regressing salary on grade level in a suit alleging discrimination in initial placement and promotion; the proper treatment of possible pre-1972 discrimination; and the usefulness of regression analysis given its inability to account for intangible factors.

**47.** One such regression, it is clear from the description, would not be entitled to weight, even if introduced into evidence. By including grade level when hired as an independent variable, the experts improperly absolved defendants from any liability for discriminatory initial grade placement. It is commonly accepted that it is inappropriate to include as an independent variable a factor within defendants' control unless it has been established that they did not discriminate in exercising that control. See *Presseisen, supra,* 442 F.Supp. at p. 614; and see, 885–886 *supra.*

**48.** The low power of the model can be observed from the fact that almost all of the education variables in these regressions were likewise not statistically significant. This, of course, does not prove that educational achievement had no effect on salaries at NARDAC.

plaintiff[s]." *Texas Department of Community Affairs v. Burdine, supra,* —— U.S. at ——, 101 S.Ct. at 1091. Because defendants have failed to produce evidence that would allow the Court to conclude that they did not unlawfully discriminate, the Court, applying the burden-of-production rule articulated by the Supreme Court in *Burdine,* finds that defendants have not rebutted plaintiffs' prima facie case of discrimination.

## IV

The Court having concluded that plaintiffs have established a *prima facie* case and that defendants have been unable to rebut their proof, might leave the matter to rest there, with judgment on the class action aspects of this suit being entered for plaintiffs on that basis alone. However, the Court has considered evidence other than the statistics in support of and in opposition to the class action claim, and it finds that such evidence substantially strengthens the conclusion that plaintiffs are entitled to a finding in their favor.

There was testimony from a number of present and former employees of NARDAC concerning various discriminatory practices, long after 1972, including a denial of supervisory opportunities to women, assignment of women to lower level positions, and the preselection[49] of men for supervisory positions.[50] The Court was especially impressed by the testimony of several former employees of the agency who were very credible witnesses and who related both specific instances and general impressions of discrimi-

nation against women at NARDAC. Some of these individuals left NARDAC for other federal employment and thereafter advanced to higher grades far more rapidly than had been possible at NARDAC.[51]

Defendants' witnesses denied the existence of discrimination in the areas under their control. However, several of them testified that preselection and failure to post vacancy announcements had been practices within the agency, and another conceded that the technical shortcomings which impeded the advancement of one of the plaintiffs herein had been overlooked in the case of at least one male. Overall, defendants' witnesses, whatever their subjective beliefs, and indeed their individual good faith, fell far short of rebutting plaintiffs' proof of entrenched sex discrimination.

The evidence compels the conclusion that during the years in question NARDAC was an agency—perhaps not atypical in Navy terms during that period—where men were expected to be in positions of leadership and where women were relegated to tasks involving less authority, less discretion, less opportunity, and less pay.

For the reasons stated, the Court concludes that plaintiffs have proved discrimination against the class, that defendants have been unable to refute that proof, and that the class of plaintiffs are entitled to judgment in their favor.[52]

## V

In addition to the class action, suit was brought on behalf of five individual

---

**49.** Several government witnesses conceded that preselection was occurring at various times at the agency. Compare Federal Personnel Manual, chapter 335, subchapter 3.

**50.** Additionally, Judge June Green of this Court found discrimination on the basis of "sex or race" against one black female employee of NARDAC. *Robinson v. Warner,* 8 E.P.D. ¶ 9452 (D.D.C.1974). And see, notes 66 and 67 *infra* and text thereto.

**51.** For example, Ann Eakin testified that a "buddy system" operated at NARDAC from which women were excluded; women were seldom given project leader status; and they were

generally retained in the less desirable programming and documentation areas. When she transferred to the Veterans Administration she quickly advanced to a GS–13. Stacy Day, who left NARDAC to join the United States Marshal's Service, testified that career opportunities were few for women at NARDAC, and men were being given most of the more desirable assignments. Kathy Schabaker and Crystal Halichi both supported this testimony; and both advanced far more rapidly after they left NARDAC than they had before.

**52.** The relief aspects are discussed in Part VI *infra.*

plaintiffs.[53] Some of these individuals have proved discrimination or retaliatory action;[54] others have not.

■■■ A. Yvonne Trout complains primarily[55] that (1) she was transferred on a detail in 1970 from one part of NARDAC where she claims to have performed well to another with which she was unfamiliar and for which she was less well suited; and (2) in 1975,[56] after she had been detailed as an acting program manager to the Automated Data Processing Program Reporting System (ADPPRS) program, reprisals were taken against her on account of her EEO complaints and her advocacy of the rights of women employees.

Ms. Trout objected to the 1970 transfer on the ground that it constituted an unfair labor practice and violated her rights as a federal employee. Nevertheless, it is clear that the agency's action was legitimate. A need arose in the agency for computer systems analysts and programmers in a higher priority project, and Ms. Trout as well as a male computer analyst were detailed to that project. The individual who made the selection, and who was a credible witness, testified that she was chosen only because of she appeared well suited for this assignment. Following her objections, and after a four-day hearing,[57] all the complaints were rejected. Almost two years later, Ms. Trout for the first time injected the issue of sex discrimination.[58] However, in addition to being late, the claim, for the reasons detailed above, wholly lacks substantive merit.

Ms. Trout's 1975 program was cancelled essentially because she was a poor manager and because the program, largely for that reason, did not meet with success. Because of her abrasiveness, a number of her most expert subordinates left, and she generally found it difficult to work with their replacements, whether men or women. The program Ms. Trout headed at the time was an important one for NARDAC and that agency had no interest in seeing it fail, through cancellation or otherwise. Ultimately it turned out, however, that in view of the lack of success the program had achieved under her leadership, there was no

**53.** The testimony of the individual plaintiffs also tended, in varying degrees, to support the class action aspects of this lawsuit.

**54.** In order to prevail on a retaliatory action claim, a plaintiff must demonstrate a causal connection between protected activities and adverse action. See, e. g., *EEOC v. Locals 14 and 15,* 438 F.Supp. 876 (S.D.N.Y.1977).

**55.** The allegations made by these plaintiffs, and particularly those of Ms. Trout, are at best confusing in that major and minor complaints are indiscriminately recited, sometimes without a clear delineation of what is claimed to be sex discrimination or retaliation and what is contended to be mere supporting data. Since 1975, Ms. Trout has filed at least five additional EEO complaints, the last one in February 1980. Thus, she complained, *inter alia,* that in 1972 she was improperly passed over for six promotions and that after filing a grievance her rank on a technical evaluation roster was substantially reduced. The 1972 promotion actions did not involve discrimination on account of sex: two of the individuals promoted were women. However, it appeared that merit promotion procedures had not been strictly followed, and Ms. Trout was for that reason granted a promotion to GS–14. As for the technical evaluation roster, the diminished level of her performance

is corroborated by a Letter of Caution and Requirement Ms. Trout received on April 13, 1971, which indicates a "failure to perform to the level of [her] assessed capability." Of the remaining complaints, one involved the closing of a door by another program manager who sought to escape a dispute with Ms. Trout; another was directed at, among others, male and female employees of the Navy, the Department of Justice, and the U. S. Attorney's Office; and the last one involves a promotion to GS–15 she unsuccessfully sought. While not all of these matters are discussed in this Opinion, the Court has considered all of the allegations properly before it and the evidence relating to them, and finds the complaints to be without merit. (It may also be noted that Ms. Trout was hired by NARDAC after interviews with three men all of whom, according to her allegations, are part of a pattern of sex discrimination against her at the agency.)

**56.** This complaint is embodied in No. 78–1098.

**57.** There also were numerous informal conferences with the commanding officer and others.

**58.** For that reason, her sex discrimination complaint may well be untimely.

realistic choice other than to cancel it.[59] The Court finds that none of the actions surrounding the 1975 program cancellation were motivated either by discrimination or by retaliation.

There is no question but that this particular plaintiff has had problems at NARDAC, but these problems were essentially due to her personality rather than her sex. Throughout her tenure at the agency, Ms. Trout complained, almost incessantly, often about extremely petty bureaucratic matters.[60] While no doubt this plaintiff is highly intelligent, she was not as successful at NARDAC as she expected to be largely because she has consistently been unwilling to accommodate herself to the legitimate needs and concerns of her supervisors, co-workers, and subordinates,[61] whether male or female.[62] Notwithstanding its conclusion regarding the class, the Court finds that Ms. Trout has failed to prove her individual claims with respect to either of the actions she has brought, and these claims will be dismissed.

■ B. Marie Bach,[63] security specialist in charge of automatic data processing (ADP), was removed from her position in 1976, and a younger white male was placed in charge of the program. The reason given for this change was that her successor, because of his computer background, was better able to carry out the ADP security functions. The Court finds this to have been a mere pretext for discrimination on account of sex.[64]

While there are legitimate differences of opinion on the technical issue of whether ADP security specialists should more appropriately have a background in security or one in data processing, the evidence here shows that these technical issues were not the predominant reasons for the personnel actions regarding this plaintiff. Ms. Bach was described by most witnesses as a highly respected security manager.[65] It is also clear that computer analysts work frequently, if not usually, under the supervision of security specialists, and that the latter ordinarily have overall responsibility for ADP security systems. That, indeed, was the situation at NARDAC until Ms. Bach's removal in 1976.

Rear Admiral Nance, who at the time of that removal was in charge of Navy equal employment opportunity matters, ordered that all of her duties be returned to her.[66] NARDAC complied temporarily and with obvious reluctance, but ultimately it carried

---

**59.** Nevertheless, Ms. Trout retained her GS–14 grade.

**60.** A female co-worker, Lois Henry, testified that Ms. Trout informed her that she would let the project slip two years, and "embarrass the hell out of" NARDAC's commanding officer. Daniel Foster, a black supervisor at NARDAC, stated that he was "outraged" by Ms. Trout and that he regarded her actions as amounting to strong and persistent insubordination.

**61.** Charles Bremer, a principal target of Ms. Trout's complaints, testified that Ms. Trout was almost constantly badgering him and that she represented the most difficult experience of his professional life. The Court regards Bremer as a credible witness.

**62.** For example, at the time of the 1970 transfer, she consistently and abrasively objected to the detail, keeping a public "count down" calendar. Again, when a controversy ensued between plaintiff and one of her supervisors regarding a female lieutenant he had hired, she became embroiled in that particular controversy although she had promised that she would

not become involved in personnel matters outside her immediate jurisdiction.

**63.** Ms. Bach is the plaintiff in No. 1206–76, but she is not a member of the class in No. 55–73 because she was not a professional technical employee of NARDAC.

**64.** The Court also discounts the explanations provided by NARDAC management that Ms. Bach was being transferred to give her policy-making authority.

**65.** The head of ADP security inspections under the Chief Navy Material Command described her as one of the best such managers he had ever observed.

**66.** Admiral Nance also directed that plaintiff's performance evaluation rating be upgraded, that an EEO committee closely monitor opportunities for management development among women at NARDAC, and that EEO training be given to managers and supervisors at the agency.

out its original plans, to the detriment of this plaintiff.[67]

For the reasons stated, the Court finds that plaintiff Bach has sustained her burden of proof with regard to her claim under Title VII, that defendants have failed to rebut that proof, and that she is entitled to a judgment in her favor.

■ C. Charlene Hardy[68] complained about failure to receive training to which she claims to have been entitled, and the receipt of a Letter of Caution and Requirement and a Letter of Reprimand in 1974. The Court finds that there is no merit to her complaints.

Ms. Hardy was not permitted to attend a seminar in advanced computer technology because the course was too complex given her experience and abilities and because of several other shortcomings from which she suffered, in particular her habitual tardiness. Insofar as the two disciplinary letters were concerned, they were fully justified by her performance. Ms. Hardy arrived late on so many occasions that she had amply exhausted her leave.[69] She was counseled a number of times,[70] and when ultimately her leave record failed to improve, she was given a letter of reprimand. The patience NARDAC exhibited with respect to this particular employee was the antithesis of discrimination.

The Court finds that defendants did not violate Title VII in their treatment of Ms. Hardy either with respect to the matters referred to above or in any other respect,[71]

and her complaint will accordingly be dismissed.[72]

■ D. Clara Perlingiero's[73] complaint originated with a reorganization in 1971 of an important ADPPRS project in which she had been an assistant project leader performing satisfactory work. As a result of the reorganization, more people were assigned to this project, it was renamed Code 70, and three white males were appointed to supervise it. One of the new supervisors, Charles Bremer, was placed in charge, and he soon received a promotion to GS–15. Another new supervisor, Robert W. Mac-Phail, a retired military officer who had little background in computers and none in ADPPRS, was rapidly promoted to a GS–14 position that had not been advertised competitively. Ms. Perlingiero alleges that MacPhail was preselected for that position, and her allegation in that regard is supported to an extent by the acknowledgment of a defense witness that preselection did occur, apparently fairly routinely, during that period. At the same time, Ms. Perlingiero remained at her GS–12 level and was given only low-level programmer's duties and responsibilities.

Immediately after she filed a complaint of discrimination in 1972, Ms. Perlingiero's evaluation dropped from the top one-third to the very bottom of the GS–12 group at the agency. At about the same time, she was transferred to the communications systems department; she was given no supervisory training or assignments which would enhance her promotion potential; and she

---

**67.** Among other discriminatory actions taken against Ms. Bach were the award of unwarranted inferior performance ratings (which were not upgraded notwithstanding Admiral Nance's orders); the removal of her office to an undesirable location; failure to provide her with appropriate training; and failure to classify her position at a grade comparable to that of other security specialists in the Navy with similar functions.

**68.** Ms. Hardy is the plaintiff in No. 76–315 and she is also a member of the class in No. 55–73.

**69.** Leave without pay was first denied but then granted.

**70.** Plaintiff had a number of family problems which contributed to her tardiness. The agency, commendably, adjusted her work hours to allow her to take care of her family obligations, but her attendance did not improve.

**71.** Likewise unsupported are her claim that she was pressured not to file an EEO complaint and that she was instructed, for discriminatory or retaliatory reasons, not to associate with another black female employee of NARDAC.

**72.** Ms. Hardy voluntarily resigned from the federal service in 1976 after the birth of a child.

**73.** Ms. Perlingiero is a named plaintiff and class representative in No. 73–55.

was kept in the communications systems department from 1972 until September, 1979.[74] In January of 1974, the Navy concluded that procedural irregularities had occurred in connection with applications Ms. Perlingiero had made in 1972 and promoted her to GS–13, her present rank.

In September, 1979, plaintiff was made a project leader. However, she remained at her GS–13 rank even though her male predecessor had been a GS–14, and she apparently was given lower level duties and responsibilities than those which had been exercised by that predecessor. In addition, a new layer of three supervisory positions was established at the GS–14 level; Ms. Perlingiero applied for all three; and all of them were again given to white males who were junior to her.[75]

In May, 1980,[76] Ms. Perlingiero's title was changed from project leader to "point of contact." She testified that, once again, her responsibilities were being eroded in favor of male supervisors, and she also complained of an announced transfer of her communications systems group to Chelthenham, Maryland, as part of the Naval Telecommunications Command, a change she alleges is retaliatory and will further adversely impact her career.

Several of her supervisors testified to Ms. Perlingiero's shortcomings in some technical fields, claiming that the real leaders in her department were in systems programs rather than in analysis, and that she simply lacks the background to advance. However, the Court is convinced that the various actions taken against this plaintiff were based on sex discrimination and on retaliation, as distinguished from objective effi-

ciency-related factors. Ms. Perlingiero's evaluations were favorable until she filed her EEO complaints; she was thereafter given the lowest possible rating and then transferred to a department in which she had no background. She was repeatedly passed over for promotion in favor of males, some of whom had inferior credentials or were junior to her, and at least one of whom clearly was preselected for the position. Finally, she has been deprived of assignments commensurate with her various positions, responsibilities, and assignments that would have enabled her to prove her ability and to advance to higher-level positions. For the foregoing reasons, the Court finds that this plaintiff has sustained her burden of proof with regard to her claim under Title VII and that defendants have not rebutted this proof, and judgment will accordingly be entered in her favor.

E. Joan Creighton[77] complains primarily[78] about her removal from her administrative position and her downgrading to a lower ranked job, and secondarily about the fact that, while she is presently acting as an interim director of training, she has not been granted that position on a permanent basis.

Ms. Creighton was hired in 1974 at a GS–11 level as an assistant to Murray Silverman, a GS–15 computer systems analyst who had been performing personnel duties for the commanding officer. In December, 1975, when Silverman's resignation became effective, Ms. Creighton took over his personnel duties. At about the same time, she was promoted to a GS–12.

The major reorganization of the Navy ADP in 1977 combined NAVCOSSACT, for

---

**74.** This plaintiff had no background whatever in the subject matters under the jurisdiction of that department.

**75.** Plaintiff claims that these individuals, too, were preselected.

**76.** Inasmuch as the entire matter involving this plaintiff was before the Court, it has also considered the 1980 claim. See, e. g., *Silver v. Mohasco Corp.*, 602 F.2d 1083 (2d Cir. 1979), rev'd on other grounds, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980); *Ortega v. Con-*

*struction & General Laborers' Union No. 390,* 396 F.Supp. 976, 980 (D.Conn.1975).

**77.** Ms. Creighton is a plaintiff in No. 78–1206, but she is not a member of the class in No. 55–73 because she is not a female professional technical employee of NARDAC.

**78.** Like the other individual plaintiffs, Ms. Creighton also raised a host of lesser issues and grievances. All of these matters have been fully considered by the Court.

which Ms. Creighton worked, with three other organizations to form NARDAC.[79] The direction of the personnel office of the new organization, to which Ms. Creighton aspired, was given to one Lois Henry, a female with a GS–13 who had been performing similar personnel duties for NMCSA, one of the other merged organizations, and Ms. Creighton became her subordinate.

The defendants' evidence showed that Ms. Creighton's performance as personnel director had been poor, and several witnesses testified that she ran a disorganized office.[80] Lois Henry, who was given the position to which Ms. Creighton aspired, was clearly better qualified by every appropriate measure, and there was nothing improper about this personnel action. The Court finds that sex discrimination or reprisals were not even remotely involved.[81]

In 1977, Ms. Creighton was transferred to the Training Department, and she has been the acting director of that department since that time. The director position has been classified GS–13 in the GS 334 computer series. Ms. Creighton herself, who is classified in the GS 301 personnel series, cannot qualify for the computer series classification because she does not have the technical background to supervise computer specialists in their technical duties. The Court is convinced that defendants are making a good faith effort to reclassify Ms. Creighton's position so that she can qualify for a GS–13. If and when that occurs, she will presumably be promoted. In short, this particular plaintiff has failed to sustain her complaints of discrimination and retaliation with sufficient evidence, and her claim will accordingly be dismissed.

## VI

The briefs submitted by the parties thus far have not focused to any substantial extent on the relief that should be granted herein, particularly with respect to the class. Accordingly, the parties shall, within twenty days hereof, submit memoranda discussing methods for the determination of entitlement to relief on behalf both of the individual plaintiffs and of the members of the class. These proposals should include a discussion of the feasibility and desirability of making individualized determinations for all individuals potentially entitled to relief as opposed to utilization of some averaging formula.[82] In this connection, the parties should also address the specific procedures, formulas, and other relevant details applicable to each method.

The parties shall also address the question whether the relief issues should be resolved by the Court, by a Magistrate, or by a special master. Finally, the parties' submissions should discuss the relationship between the relief for the named plaintiffs and the relief for members of the class. Within ten days of the filing of the memoranda, reply memoranda dealing with these various issues may be submitted.

manding officer) had made a mistake and that she intended to get some money out of it.

79. See 876 *supra.*

80. In contrast, Ms. Henry's performance had been rated outstanding.

81. Capt. Paul Pfeiffer, commanding officer of NARDAC, testified that Ms. Creighton told him that Captain Clairmont (the previous com-

82. If an averaging formula is used, it might include reliance upon the statistics presented to the Court.